


**FILED**

AUG 4 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
     DEPUTY CLERK

AO 241 (Rev. 5/85)

## PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District | (EASTERN) |
|---|---|---|

| Name | Eugene Kincaide | Prisoner No. D#64290 | Case No. |
|---|---|---|---|

| Place of Confinement | California Medical Facility (UNIT: I-213-Low)<br>POB 2000<br>Vacaville, CA 95696-2000 |
|---|---|

2:10 CV 2068 DAD(HC)

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| EUGENE KINCAIDE | v.    BOARD OF PRISON HEARING (BPH) |

The Attorney General of the State of:

## PETITION

1. Name and location of court which entered the judgment of conviction under attack **Los Angeles County Superior Court (Los Angeles, CA) A#460850**

2. Date of judgment of conviction **Feb/1987**

3. Length of sentence **31-years to Life**

4. Nature of offense involved (all counts) **1st degree murder (PC 187)**

5. What was your plea? (Check one)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   **N/A**

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☒  No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☒  No ☐

NOTE: THE U.S. DISTRICT COURT (2) PREVIOUSLY ASSIGNED LAWYER (TIMOTHY WARRINER) TO PRIOR HABEAS CORPUS CASE IN KINCAIDE V. HUBBARD, #CIV-S-07-2410 (E.D.CAL,2007) WHO VOLUNTARILY PER (FRCP 41) DISMISSED WRIT IN (2008) UNTIL PETITIONER ATTENDED HIS (2009) PAROLE BOARD HEARING FOR REFILING AT A FUTURE DATE IF PAROLE IS DENIED AGAIN...

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following: **NOTE: PETITIONER IS CHALLENGING PAROLE BOARD ISSUES...**

   (a) Name of court **Unknown**

   (b) Result   ---

   (c) Date of result and citation, if known   ---

   (d) Grounds raised   ---

     ---

   (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

     (1) Name of court   **Unknown**

     (2) Result   ---

       ---

     (3) Date of result and citation, if known   ---

     (4) Grounds raised   ---

       ---

   (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

     (1) Name of court   **Unknown**

     (2) Result   ---

       ---

     (3) Date of result and citation, if known   ---

     (4) Grounds raised   ---

       ---

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes **X** No ☐

11. If your answer to 10 was "yes," give the following information:
(a) (1) Name of court **State Superior Court (Los Angeles County)**

     (2) Nature of proceeding **Habeas Corpus #BH-006336**

     (3) Grounds raised **Illegal Sentence Enhancement**

       **Parole Board Denial at (2004) Hearing**

(3)

AO 241 (Rev. 5/85)

Parole Board Denial at (2009) Hearing

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐   No **X**

(5) Result   **denied**

(6) Date of result   11/6/2009

(b) As to any second petition, application or motion give the same information:

(1) Name of court   **State Appeals Court (2nd District)**

(2) Nature of proceeding   **Habeas Corpus #B-220565**

(3) Grounds raised   **Illegal Sentence Enhancement**

**Parole Board Denial at (2004) Hearing**

**Parole Board Denial at (2009) Hearing**

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐   No **X**

(5) Result   **denied**

(6) Date of result   12/9/2009

(c) Did you appeal to the highest state court having jurisdiction, the result of action taken on any petition, application or motion? **Habeas Corpus #S-179093   (Denial: 7/14/2010)**
**\*California Supreme Court**

(1) First petition, etc.      Yes **X**   No ☐
(2) Second petition,          Yes **X**   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

**Not Applicable**

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
   CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition wili be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b)  Conviction obtained by use of coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)  Conviction obtained by a violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by a violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

A.  Ground one:    ILLEGAL ENHANCEMENT OF SENTENCE

(See: Appendix at Attachment/Abstract of Judgement & Order)

Supporting FACTS (state *briefly* without citing cases or law)   In 1987, petitioner received 25-years to life for PC 187/murder; 5-years on PC 211/robbery; and 1-year enhancement on PC 12022/gun use. Petitioner contends he received illegal high term determined by Judge and not Jury and move for resentencing or modification of lo/mid/hi term by the court or a jury due to petitioner being eligible for middle/maximum term or low/minimum term instead of enhancement.

B.  Ground two:   ILLEGAL PAROLE BOARD DENIAL AT (2004) PAROLE HEARING

(See: Appendix at EX#B, EX#C, & EX#E).

Supporting FACTS (state *briefly* without citing cases or law):   Petitioner meets the criteria and matrix for the (2004) Parole Board Hearing for release and Board absent some evidence rule illegally denied Petitioners parole and ordered 4-year denial until (2008), Petitioner did not reappear for another parole hearing until (2009). The court is moved to order release/discharge from custody.

(5)

AO 241 (Rev. 5/85)

C. Ground three:  ILLEGAL PAROLE BOARD DENIAL AT (2009) PAROLE HEARING...
(See: Appendix at EX#A, EX#D, & EX#E).

Supporting FACTS (state *briefly* without citing cases or law):  Petitioner meets the criteria and matrix for the (2009) Parole Board Hearing for release and Board absent some evidence rule illegally denied Petitioners parole and ordered 5-year denial until (2014). The court is moved to order release/discharge from custody.

D. Ground four:  N/A

Supporting FACTS (state *briefly* without citing cases or law):   N/A

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐   No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing   M. Carney, Esq.,   (Los Angeles)

(b) At arraignment and plea   M. Carney, Esq.,   (Los Angeles)

AO 241 (Rev. 5/85)

(c) At trial    **M. Carney, Esq., (Los Angeles)**

(d) At sentencing **M. Carney, Esq., (Los Angeles)**

(e) On appeal    **M. Carney, Esq., (Los Angeles)**

(f) In any post-conviction proceeding    **Timothy E. Warriner, Esq., (Sacramento)**

(g) On appeal from any adverse ruling in a post-conviction proceeding    **None**

16  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes **X** No ⌐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ⌐ No **X**
(a)  If so, give name and location of court which imposed sentence to be served in the future:

**N/A**

(b)  Give date and length of the above sentence:

**N/A**

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ⌐ No **X**

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

**N/A**
_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

**July 24, 2010**
_____
(date)

x _Eugene Kincaide_
_____
Signature of Petitioner
**EUGENE KINCAIDE (Petitioner)**

(7)

S    E    R    V    I    C    E

**Case Name:** KINCAIDE V. BOARD OF PRISON HEARING

**Case Number:** NEW CASE

**Court:** U.S. DISTRICT COURT (EASTERN)

# PROOF OF SERVICE BY MAIL

I, __EUGENE KINCAIDE__ declare:

That I am over the age of eighteen years of age and am a party to the above entitled cause of action. That I reside in Solano County, California at the California Medical Facility, at 1600 California Drive, P.O. Box 2500, Vacaville, California, 95696-2500.

That on ___7/24/2010___ I served the attached: a true copy of the attached:

*PETITION FOR WRIT OF HABEAS CORPUS

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal legal mail collection system at the California Medical Facility, Vacaville, California, addressed as follows:

Clerk of the Court
U.S. District Court
501 I Street
Sacramento, CA 95814

Office of Attorney General
1300 I Street
Sacramento, CA 94244

I declare under penalty of perjury and under the laws of the State of California that the foregoing is true and correct. That this proof of service was executed on ___7/24/2010___ at the California Medical Facility, Vacaville, California.

EUGENE KINCAIDE
_____
**Declarant**

*Eugene Kincaide*
_____
**Declarant's Signature**

Eugene Kincaide

D#64290 (Unit: I-213-Low)

California Medical Facility

P.O. Box 2000

Vacaville, CA 95696-2000

<u>IN PRO PER</u>:

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENE KINCAIDE ) | # _____ |
| ) | |
| Petitioner ) | <u>A  P  P  E  N  D  I  X</u> |
| ) | |
| v. ) | APPENDIX OF EXHIBITS TO THE |
| ) | <u>PETITION FOR WRIT OF HABEAS CORPUS</u> |
| BORRD OF PRISON HEARING ) | |
| ) | |
| Respondent ) | |
| ) | |
| _____ ) | |
| _____ ) | |

## \*\*\*I N D E X\*\*\*

ATTACHMENT: Abstract of Judgement & Minute Order...

EX#A: (2009-2010) 2nd Round State Court Habeas Corpus Writs
   RE: (2009) Parole Board Hearing Denial

EX#B: (2007) 1st Round State Court Habeas Corpus Writs
   RE: (2004) Parole Board Hearing Denial

EX#C:(2004) BPH-Transcripts
   RE: Parole Board of Prison Hearing

EX#D: (2009) BPH-Transcripts
   RE: Parole Board of Prison Hearing

EX#E: Petitioners (Declarations)
   Petitioners (Educational Records)
   Petitioners (Self-Help Programs, Certificates & Chronos)

# ATTACHMENT

" "

———————

Date: 02-12-87

HONORABLE: CHARLES E FRISCO    JUDGE

L LONGAKER    Deputy Sheriff

T WILLS

H BAUGH    Reporter

(Parties and counsel checked if present)

A 460850

PEOPLE OF THE STATE OF CALIFORNIA

VS

01) KINCAIDE, EUGENE

aka: KINCAIDE, EUGENE

X-130833

Counsel for Plaintiff    IRA REINER, DISTRICT ATTY. BY

J ALLEN    DEPUTY

Counsel for Defendant    M CARNEY

NATURE OF PROCEEDINGS PROBATION AND SENTENCE

(Boxes checked if order applicable)

PROBATION DENIED. SENTENCE AS INDICATED BELOW.

Whereas the said defendant having .....been.................duly......found................................................

guilty in this court of the crime of MURDER, in violation of Section 187 Penal Code, a felony, as charged in Count I of the Information.

Murder fixed at FIRST DEGREE.

Jury finds that the allegation as to Count I, pursuant to Penal Code Section 12022(a) is true.

Court cites reasons in aggravations as: victim was particularly vulnerable; crime involved multiple victims; defendant conspired with co-deft. in committing the offense; the facts of the case indicate premeditation and deft. has an extensive and appalling prior juvenile record, and extensive adult history.

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the

☐ County Jail of the County of Los Angeles for the term of.......................................................

☒ State Prison for twenty-five years to life 25 years to life plus 5 years as to Count III, plus 1 year as to 12022(a) PC on Ct. III. Armed allegation (12022(a) PC) as to Ct. I is stayed; said stay to become permanent upon completion of prison time.

Counts to run consecutive to each other.

☒ Defendant is given credit for.....1672.................days in custody, includes 557 days GT/WT.

It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles

☒ to be by him delivered into the custody of the Director of Corrections at the California State Institution for.....Men...................at.............Chino.................................

☐ Remaining count(s) dismissed in interests of justice.

☐ Bail exonerated.

Page 1 of 2 pages

JUDGMENT

2   76J 805A - (REV.7-78)

C109

ENTERED

2-12-87

COUNTY CLERK

AND CLERK OF THE

SUPERIOR COURT

PINK ORIGINAL TO FILE    GREEN COPY TO PROBATION EXPED

WHITE COPY TO MICROFILM    GOLDENROD TO COUNTY JAIL

YELLOW COPY TO STATE WIDE DISTRIBUTION

# ABSTRACT OF JUDGMENT — COMMITMENT

FORM DSL 290

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
**BRANCH** SOUTHEAST

COURT I.D. 190009

**PEOPLE OF THE STATE OF CALIFORNIA** versus [X] PRESENT  [ ] NOT PRESENT
**DEFENDANT:** KINCAIDE, EUGENE
**AKA:** KINCADE, EUGENE

CASE NUMBER(S): A 460850 - A  - B  - C  - D  - E

**COMMITMENT TO STATE PRISON**
**ABSTRACT OF JUDGMENT** [ ] AMENDED ABSTRACT

| DATE OF HEARING | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 02 12 87 | SE B | C E FRISCO | T WILLS |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| H BAUGH | J ALLEN | M CARNEY | X-130833 |

**1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:**

A. [ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY (JURY TRIAL / COURT TRIAL / PLEA) | TERM (L,M,U) | SENTENCE RELATION | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|---|
| 3 | PC | 211 | ROBBERY | 83 | 11 17 86 | X | U | | 5 |

**2. ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):**

| COUNT | 12022(a) C/F S I | 12022(b) C/F S I | 12022.3(a) C/F S I | 12022.3(b) C/F S I | 12022.5 C/F S I | 12022.6(a) C/F S I | 12022.6(b) C/F S I | 12022.7 C/F S I | 12022.8 C/F S I | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | X   X | | | | | | | | | 1 |

**3. INCOMPLETED SENTENCE(S) CONSECUTIVE:**

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |
| | | |

**5. A. NUMBER OF PRIOR PRISON TERMS:**

| | S | C/F | S | I |
|---|---|---|---|---|
| 667.5(a) | | | | |
| 667.5(b) | | | | |
| 667.6(b) | | | | |

**B. NUMBER OF PRIOR FELONY CONVICTIONS:**

| | S | C/F | S | I |
|---|---|---|---|---|
| 667.6(a) | | | | |

**4. OTHER ORDERS:**

**6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A):**

**7. TIME STAYED § 1170.1(a) [5-YEAR LIMIT] AND/OR § 1170.1(f) [DOUBLE BASE LIMIT]:**

**8. TOTAL TERM IMPOSED:** → 6

**9. EXECUTION OF SENTENCE IMPOSED:**

[X] A. AT INITIAL SENTENCING HEARING
[ ] B. AT RESENTENCING PURSUANT TO DECISION ON APPEAL
[ ] C. AFTER REVOCATION OF PROBATION
[ ] D. AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT [P.C §1170(d)]

| DATE SENTENCE PRONOUNCED: MO DAY YEAR | CREDIT FOR TIME SPENT IN CUSTODY: | TOTAL DAYS | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| 2 12 87 | | 1672 INCLUDING: | 1115 | 557 | [ ] DMH  [ ] CDC |

**DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:**

[X] FORTHWITH
[ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS

INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:

[ ] CALIF. INSTITUTION FOR WOMEN — FRONTERA
[ ] CALIF. MEDICAL FACILITY — VACAVILLE
[ ] OTHER (SPECIFY): ___
[X] CALIF. INSTITUTION FOR MEN — CHINO

**CLERK OF SUPERIOR COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE ___  DATE FEB 18 1987

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code §1203c. A copy of the sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code §1203.01. Attachments may be used but must be incorporated by reference.

Form Adopted by the Judicial Council of California
Effective July 1, 1981

**ABSTRACT OF JUDGMENT — COMMITMENT**
FORM DSL 290

Pen.C. 1213.5.

DISTRIBUTION: PINK COPY — COURT FILE. YELLOW COPY — DEPARTMENT OF CORRECTIONS. WHITE COPY — ADMINISTRATIVE OFFICE OF THE COURTS.

# EXHIBIT



"A"

S179093

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

In re EUGENE KINCAIDE on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.


GEORGE
_____
*Chief Justice*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| In re | B220565 |
|---|---|
| EUGENE KINKAIDE, | (Los Angeles County Super. Ct. No. BH006336) |
| on | |
| Habeas Corpus. | **ORDER** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus, filed November 30, 2009. The petition is denied.

COURT OF APPEAL - SECOND DIST.

F I L E D

DEC 0 9 2009

JOSEPH A. LANE ........................ Clerk

J. GUZMAN ........................ Deputy Clerk

DOI TODD, Acting P. J.    ASHMANN-GERST, J.    CHAVEZ, J.

<table>
<tr><td colspan="2"><strong>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES</strong></td><td>Reserved for Clerk's File Stamp</td></tr>
</table>

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | **CONFORMED COPY**<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>**NOV 0 9 2009**<br><br>John A. Clarke, Executive Officer/Clerk<br>BY_____, Deputy<br><br>Julia Esparza |
| PLAINTIFF/PETITIONER:<br><br>EUGENE KINCAIDE | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH006336 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time
☐ Order to Show Cause
☐ Order for Informal Response
☐ Order for Supplemental Pleading

☒ Order re: Petition for Writ of Habeas Corpus
☐ Order re: Writ Error Coram Nobis
☐ Order re: Appointment of Counsel
☐ Copy of Petition for Writ of Habeas Corpus /Suitability Hearing Transcript for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
Julia Esparza

Eugene Kincaide
D-64290
California Medical Facility
P.O. Box 2000
Vacaville, CA 95696-2000

Department of Justice – State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

A3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | NOVEMBER 6, 2009 | | | |
| Honorable: | PETER ESPINOZA | Judge | J. A. RAMIREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 006336
In re,
EUGENE KINCAIDE,
    Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

    The Court has read and considered the Petition for Writ of Habeas Corpus filed on September 4, 2009 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner currently presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See *In re Lawrence* (2008) 44 Cal.4th 1181, 1205-06; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; Cal. Code Reg. tit. 15, §2402.

    The Petitioner was received into the Department of Corrections and Rehabilitation on August 18, 1987 after convictions for murder in the first degree and robbery. Cal. Pen. Code §§ 187, 211. He was sentenced to a term of twenty-five years to life plus six years for the robbery conviction and a firearm sentencing enhancement. His minimum parole eligibility date was February 4, 2004.

    The record reflects that on the evening of December 17, 1983, the Petitioner and a co-defendant were waiting outside William Mendoza's place of business in the city of Los Angeles when Mendoza and Marilyn High exited the building. The Petitioner, armed with a knife, approached High, forced her to the ground and robbed her. The co-defendant approached Mendoza armed with a firearm, but Mendoza was unwilling to give up his valuables. The co-defendant then shot Mendoza in the eye, killing him instantly. High then indicated that there was no cash on site in the building and the two men fled the scene.

    The Board found the Petitioner unsuitable for parole after a parole suitability hearing held on April 16, 2009. The Petitioner was denied parole for five years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision in large part on the Petitioner's commitment offense, criminal history, and his disciplinary record in prison. The Court finds that there is some evidence to support the Board's determination that the Petitioner currently presents an unreasonable risk of danger to society.

    The Board began its decision by discussing the Petitioner's commitment offense, finding the murder "especially heinous" because it involved multiple victims and because the motive was very trivial. Cal. Code Regs., tit. 15, § 2402, subds. (c)(1)(A), (c)(1)(E). The Court agrees. There were two victims in this case, even if only one was actually murdered. Moreover, Mr. Mendoza was killed simply because he refused to give the

1

A 4

| Date: | NOVEMBER 6, 2009 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. A. RAMIREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 006336
In re,
EUGENE KINCAIDE,
          Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

co-defendant his wallet. Such a motive for murder is very trivial in relation to other motives for murder. *In re Ross* (2009) 170 Cal. App. 4th 1490, 1507 [holding motive for murder was "very trivial" where motive was to steal victim's boots and wallet]. The Petitioner rightly asserts that his 26-year-old commitment offense is not, by itself, probative of his current dangerousness. Nevertheless, the Court finds that the commitment offense provides some evidence of his present dangerousness when viewed in light of other evidence in the record that supports the Board's conclusion. See *In re Lawrence, supra,* 44 Cal.4th at 1211, 1228.

In addition to his commitment offense, the Board also considered two other factors in the record to conclude that the Petitioner is unsuitable for parole. The Board briefly addressed its concern with the Petitioner's lengthy criminal history, including numerous robberies and burglaries as well as a conviction for battery. It went on to note, however, that both the Petitioner's criminal history and commitment offense are "static factors" which "diminish in their importance over time." The Board then observed that "the important thing" in determining his present risk to public safety is "how [the Petitioner has] done since" he has been in prison. In that respect, the Board was concerned with the Petitioner's disciplinary record in prison.

In Prison, the petitioner has been issued seven CDCR-115 citations for serious violations of prison rules and thirteen CDCR-128 citations for administrative violations of prison rules. Most important among these for the Board were a 1988 citation for possessing a weapon, a 1993 citation for fighting, and a 2004 citation for mutual combat with another inmate. Indeed, it was the 2004 citation that the Board thought most probative of the Petitioner's present risk of violence. The Board was concerned that the Petitioner's inability to avoid violent confrontation in a controlled environment as recently as 2004 indicated that the Petitioner is presently dangerous. Given the grave consequences of his past violent behavior, the Petitioner's recent violent outburst constitutes some evidence to support the Board's determination that he presently poses an unreasonable risk to public safety. *In re Lawrence, supra,* 44 Cal.4th at 1212.

The Board also considered the Petitioner's post-conviction rehabilitative progress. The Board commended the Petitioner for his excellent work reviews, his progress toward completing his first vocational certificate, his enrollment in anger management courses after his last violent confrontation, his participation in AA, and his diligence in researching and securing post-release employment and housing plans. It was particularly impressed with the Petitioner's progress because the Petitioner suffers from a learning disability and mild cognitive impairment. It further complimented the Petitioner on his remarkable artistic ability. The Board encouraged the Petitioner to remain discipline-free, to complete his vocational certificate in janitorial services,

2

| Minutes Entered |
|---|
| 11-06-09 |
| County Clerk |



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | NOVEMBER 6, 2009 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. A. RAMIREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

*(Parties and Counsel checked if present)*

BH 006336
In re,
EUGENE KINCAIDE,
    Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

and to continue to engage in self-help and educational programs to the extent that his cognitive faculties permit. It then concluded that the Petitioner would pose an unreasonable threat to public safety at this time and found him unsuitable for parole for five years. Cal. Pen. Code §3041(b). Because the Board's interpretation of the evidence is "reasonable and reflects due consideration of all relevant statutory factors," the Court affirms the Board's judgment. *In re Shaputis* (2008) 44 Cal.4th 1241, 1258.

The Petitioner asserts that a number of other justifications that the Board gave in denying his parole application were inadequate. Because the Court finds that the reasons listed above provide sufficient evidence of the Petitioner's current dangerousness to warrant a denial, the Court declines to address his other claims.

The Petitioner also contends that the Board's application of The Victim's Bill of Rights Act of 2008, or Marsy's Law, violates the *ex post facto* clause of the United States Constitution. The Court rejects this argument. The Board properly applied the law as set forth in Art. I Sec. 28 of the California Constitution and Cal. Pen. Code § 3041.5. The new standard does not trigger *ex post facto* concerns because it does not change the applicable indeterminate term, the formula for earning sentence reduction credits, or the standards for determining either the initial date of parole eligibility or the prisoner's suitability for parole. *John L. v. Superior Court* (2004) 33 Cal. 4th 158, 181-182; see also *Cal. Dep't of Corr. v. Morales* (1995) 514 U.S. 499, 512-513 [rejecting a claim that a post-conviction change in the frequency of parole suitability hearings violated the *ex post facto* clause of the U.S. Constitution].

Subsequent hearings for inmates who are not granted parole must be scheduled 15 years after a finding of unsuitability, unless the Board finds by clear and convincing evidence that public safety does not require that additional period of incarceration. Cal. Pen. Code § 3041.5, subd. (b)(3). Here, the Board determined by clear and convincing evidence that the Petitioner does not require more than five years of incarceration. The Court finds that, in light of the facts in the record, this was not a manifest abuse of the Board's broad discretion under Cal. Pen. Code § 3041.5, subd. (d)(2), and must affirm the Board's five-year denial.

Finally, the Petitioner argues that his sentence violates his Sixth Amendment right to trial by jury because, in assinging the upper term sentence, the sentencing judge considered a number of aggravating factors that were not found true by a jury beyond a reasonable doubt. For this proposition, he cites the decision in *Cunningham v. California* (2007) 549 U.S. 270, which held that California's Determinate Sentencing Law ("DSL") violated the Sixth amendment by permitting a judge to sentence a defendant to the upper term using

3

Minutes Entered
11-06-09
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | NOVEMBER 6, 2009 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. A. RAMIREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 006336
In re,
EUGENE KINCAIDE,
      Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

aggravating factors that had not been found true by a jury. The decision in *Cunningham*, however, is not retroactive to sentences imposed 20 years before it was decided, and the Petitioner's 1987 sentence must stand. Compare *In re Gomez* (2009) 45 Cal.4th 650, 657 [holding that *Cunningham* merely applied the rule announced in *Blakely v. Washington* (2004) 542 U.S. 296 to the California DSL]; with *Cooper-Smith v. Palmateer* (9th Cir. 2005) 397 F.3d 1236, 1245-46 [no retroactive application of *Blakely* rule to sentence imposed in 1987].

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Eugene Kincaide
D-64290
California Medical Facility
P.O. Box 2000
Vacaville, CA 95696-2000

Department of Justice – State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

4

| Minutes Entered |
|---|
| 11-06-09 |
| County Clerk |



# EXHIBIT

# B

""            ""

S151298

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re EUGENE KINCAIDE on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

AUG 2 9 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice



# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT

## DIVISION 2

February 27, 2007

In Re:  Eugene Kincaide
On
Habeas Corpus

B196160
Los Angeles County No. A460850

THE COURT:

The petition for writ of habeas corpus is denied.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date: DECEMBER 20, 2006
HONORABLE: MICHAEL A. COWELL    JUDGE
R. STRAWN    DEPUTY SHERIFF

L. ALBINO    DEPUTY CLERK
NONE    REPORTER

A460850-01

People of the State of California

01 EUGENE KINCAIDE

**(Parties and counsel checked if present)**
Counsel for the People:
Deputy District Attorney: NONE

Counsel for Defendant: NONE

NATURE OF PROCEEDINGS: AMENDED PETITION FOR WRIT OF HABEAS CORPUS

THE COURT HAS READ AND CONSIDERED THE PETITION FOR WRIT OF HABEAS CORPUS FILED ON NOVEMBER 16, 2006 AND THE PETITION IS HEREBY ORDERED DENIED.

THE PETITION IS DENIED AS BEING WITHOUT ANY MERIT.

A COPY OF THIS MINUTE ORDER IS FORWARDED TO THE PETITIONER VIA U.S. MAIL TO:

EUGENE KINCAIDE    CDC# D64290
CALIFORNIA MEDICAL FACILITY
P.O. BOX 2500
VACAVILLE, CA 95696-250

MINUTES ENTERED ON
DECEMBER 20, 2006



# EXHIBIT

# C

""



INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS



In the matter of the Life )
Term Parole Consideration )
Hearing of: )
 )
EUGENE KINCAIDE )
 )
_____ )

CDC Number D-64290

COPY

INMATE

CALIFORNIA MEDICAL FACILITY

VACAVILLE, CALIFORNIA

APRIL 22, 2004





EUGENE KINCAIDE, Inmate
DYLAN SULLIVAN, Attorney for Inmate
PATRICK SEQUEIRA, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Karin R. Lewis        Capitol Electronic Reporting

P R O C E E D I N G S

PRESIDING COMMISSIONER FISHER: Are we on record?

COMMISSIONER WELCH: Yes, we're on record in the matter of Eugene Kincaide, D-64290.

PRESIDING COMMISSIONER FISHER: Okay, Mr. Kincaide, I'm going to go ahead and get started here. This is an Initial Parole Consideration Hearing for Eugene Kincaide, CDC number D-64290. Today's date is 4/22/04. We're located at the California Medical Facility at Vacaville. The inmate was received on 8/17/87 from Los Angeles County. The life term began on 8/17/87 and the minimum eligible parole date is currently 2/24/05. The controlling offense for which the inmate has been committed is first-degree murder, case number A60850. Count one, Penal Code Section 187. There's an additional two that, included in count one is assault with a deadly weapon, Penal Code Section 245(a)(1) and an additional count three, robbery, Penal Code Section 211, with the use of a firearm, Penal Code Section 12022(a). The prisoner received a term of 31 years to life with the minimum eligible parole date currently of 2/24/05. And Mr. Kincaide, we're tape-recording this hearing and so for the purpose of voice identification, we're all going to be stating our first name and



then spelling our last name. And when we go around the table and we get to you, would you please also give us your CDC number? Okay, thank you. I'm going to start with myself and go to my right. My name is Susan Fisher, F-I-S-H-E-R. I'm a Commissioner.

COMMISSIONER WELCH: Booker Welch, W-E-L-C-H, Commissioner, Board of Prison Terms.

DEPUTY DISTRICT ATTORNEY SEQUEIRA: Patrick Sequeira, S-E-Q-U-E-I-R-A, Deputy District Attorney, County of Los Angeles.

ATTORNEY SULLIVAN: Dylan Sullivan, S-U-L-L-I-V-A-N, Attorney for Mr. Kincaide.

INMATE KINCAIDE: Eugene Kincaide, D-64290.

ATTORNEY SULLIVAN: Spell your last name.

INMATE KINCAIDE: Eugene Kincaide, D-64290.

ATTORNEY SULLIVAN: Spell Kincaide.

INMATE KINCAIDE: K-I-N-C-A-I-D-E.

PRESIDING COMMISSIONER FISHER: Okay, thank you, sir. I also would like to note for the record that we have two correctional officers in the room who are here for security purposes only and won't be participating in the hearing. Mr. Kincaide, I understand that you have difficulty reading. Is that correct?

INMATE KINCAIDE: Yes, I do.

PRESIDING COMMISSIONER FISHER: All right.

Then I'm going to read this to you. This is called the Americans with Disabilities Act and I'm going to read it aloud and if you have any questions, you let us know. So, we want to make sure that you understand it, all right? Okay. It says the Americans with Disabilities Act, also known as ADA, is a law to help people with disabilities. Disabilities are problems that make it harder for some people to see, hear, breathe, talk, walk, learn, think, work, or take care of themselves than it is for others. Nobody can be kept out of public places or activities because of a disability. If you have a disability, you have the right to ask for help to get ready for your BPT hearing, get to the hearing, talk, read forms and papers, and understand the hearing process. BPT will look at what you asked for to make sure that you have a disability that is covered by the ADA and that you have asked for the right kind of help. If you do not get help or you don't think you got the kind of help you need, ask for a BPT 1074 grievance form. You can also get help to fill it out. Do you understand that?

**INMATE KINCAIDE:** Yes, I do.

**PRESIDING COMMISSIONER FISHER:** Okay. Counsel, (inaudible). All right. Mr. Kincaide, in your file I noticed that you signed the BPT 1073

form that asks about disabilities on October 1st of 2003 and you noted that you have problems with reading and understanding. Is that correct?

INMATE KINCAIDE: Yes, I do.

PRESIDING COMMISSIONER FISHER: Okay. And did you do a -- you did an Olson Review of your file?

INMATE KINCAIDE: Yes.

PRESIDING COMMISSIONER FISHER: Did you have assistance with that, someone to help you read it and understand what it said?

INMATE KINCAIDE: Yes.

PRESIDING COMMISSIONER FISHER: All right. And I want to note for the record that your attorney is here to help you with any difficulty that you have with reading or understanding what we have here today, okay?

INMATE KINCAIDE: Yes.

PRESIDING COMMISSIONER FISHER: Is that going to be all right?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: All right. I just have a few questions I have to ask you before we can get started here. Do you have any problems walking up and down stairs or walking distances of 100 yards or more?

INMATE KINCAIDE: No, I don't.

PRESIDING COMMISSIONER FISHER: Okay. Do you need glasses or a magnifying device in order to see documents?

INMATE KINCAIDE: No, I don't.

PRESIDING COMMISSIONER FISHER: All right. Do you have any hearing impairments?

INMATE KINCAIDE: No, I don't.

PRESIDING COMMISSIONER FISHER: And have you -- are you currently in CCCMS?

INMATE KINCAIDE: Yeah, (indiscernible).

PRESIDING COMMISSIONER FISHER: All right. And are you taking any psychotropic medications?

INMATE KINCAIDE: No. They took me off.

PRESIDING COMMISSIONER FISHER: Did they?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: And are you functioning fine without them?

INMATE KINCAIDE: I'm functioning all right.

PRESIDING COMMISSIONER FISHER: Do you feel like --

INMATE KINCAIDE: Yeah, yes.

PRESIDING COMMISSIONER FISHER: Do you feel like you can participate today --

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: -- without the medications?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: All right. When you were out on the street, how far did you get in school?

INMATE KINCAIDE: Probably about the tenth.

PRESIDING COMMISSIONER FISHER: You got to the tenth grade and can't read?

INMATE KINCAIDE: Yeah. They pushed me on through.

PRESIDING COMMISSIONER FISHER: Wow. Okay, did you take any special education classes while you were growing up?

INMATE KINCAIDE: Yes, I did.

PRESIDING COMMISSIONER FISHER: All right. What kind?

INMATE KINCAIDE: Reading and stuff like that. Writing and stuff like that. Spelling my name and stuff like that.

PRESIDING COMMISSIONER FISHER: Okay.

INMATE KINCAIDE: Learning how to spell my name and last name.

PRESIDING COMMISSIONER FISHER: But they just kept moving you forward.

INMATE KINCAIDE: Yeah, they kept moving me forward.

PRESIDING COMMISSIONER FISHER: Boy. Is there any disability that you suffer from that

would prevent you from being able to participate today?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: All right. Then we're going to go forward. This hearing is being conducted pursuant to Penal Code Sections 3041 and 3042 and the rules and regulations of the Board of Prison Terms, governing parole consideration hearings for life inmates. The purpose of today's hearing is to -- is to consider the number and nature of the crimes that you were committed for, your prior criminal and social history and your behavior and programming since your commitment. We've had the opportunity to review your Central File and you'll be given the opportunity to correct it or to clarify things if you need to today. We'll reach a decision today and we'll let you know whether or not we find you suitable for parole. And if we do, the length of your continued confinement will be explained to you. We'll let you know how much longer you would have to serve if you got a parole date today. Before we go any further, I want to let you know that we expect you to be totally honest with us today.

INMATE KINCAIDE: Yes, I know.

PRESIDING COMMISSIONER FISHER: Okay. If

you don't get a date today, and this is why it's important, if you don't get a date today, this hearing is going to be the foundation for any future hearings that you have. So anything that you say today that's not truthful could have a -- could be a problem for you later at future hearings.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Okay. Nothing that happens here today will change the findings of the court. We're not here to retry your case. We're here to determine whether or not you're suitable for parole. Do you understand that?

INMATE KINCAIDE: Yes. Yes, Ma'am.

PRESIDING COMMISSIONER FISHER: Okay. The hearing is going to be conducted in two phases. I'm going to talk to you about the crime that you were committed for and your prior criminal history and your social history before you came to prison, your parole plans and any letters of support or opposition that we have in your file. Okay? And then Commissioner Welch will talk about your progress since you've been here and your counselor's report and your psychological evaluation. Once we've finished that, the Commissioners, the District Attorney and your

attorney will all have questions for you. And when you speak to the District Attorney, when he speaks, he'll talk directly to us and we'll let you answer the questions through us, okay, so you just speak to us. And then before we recess for deliberations, the District Attorney, your attorney and you will all have the opportunity to address the issue of your suitability, all right? So you can tell us then why you believe that you should be found suitable. After that, we're going to recess to deliberate and then we'll call you back in when we've made our decision and we'll announce our decision today. The California Code of Regulations states that regardless of time served, a life inmate shall be found unsuitable for and denied parole, if in the judgment of this Panel, the inmate would pose an unreasonable risk of danger to society if released from prison. You have certain rights, Mr. Kincaide, and those include the right to a timely notice of this hearing, the right to review your Central File and the right to present relevant documents. Counsel, have your client's rights been met thus far?

ATTORNEY SULLIVAN: Yes.

PRESIDING COMMISSIONER FISHER: Okay. Are there any other documents that you need to submit?

ATTORNEY SULLIVAN: Not at this time, no.

PRESIDING COMMISSIONER FISHER: Okay. You also have the additional right to be heard by an impartial Panel. Having seen the Panel members, do you have any objections, Mr. Kincaide?

INMATE KINCAIDE: What do you mean?

PRESIDING COMMISSIONER FISHER: You have the right to be heard by a Panel that would be impartial, so --

ATTORNEY SULLIVAN: That would be fair. That has no reason to judge you one way or the other.

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: No objections? Okay, Counsel?

ATTORNEY SULLIVAN: I have no objection to the Panel.

PRESIDING COMMISSIONER FISHER: Okay, Mr. Kincaide, you'll receive a written copy of our decision, our tentative decision today. And that becomes -- it becomes effective in 100 -- within 120 days. A copy of the decision and a copy of the transcript of this hearing will be sent to you and you'll have 90 days from that date to appeal, if you would like to do that. You're not required to admit your offense or discuss your offense with us today. But this Panel does accept the findings of the court to be true. Do you understand that?

INMATE KINCAIDE: Uh-hmm.

PRESIDING COMMISSIONER FISHER: All right. Is there any confidential material to be used?

COMMISSIONER WELCH: None to be used today.

PRESIDING COMMISSIONER FISHER: Okay. Once again, I have not passed the hearing checklist, did I? Do you have the packet with the forms in it? I don't have (inaudible).

COMMISSIONER WELCH: I'll get it for you (inaudible).

PRESIDING COMMISSIONER FISHER: All right. Well, while we're waiting to do that -- okay, do you have any preliminary objections?

ATTORNEY SULLIVAN: I have no preliminary objections, no.

PRESIDING COMMISSIONER FISHER: Thank you.

ATTORNEY SULLIVAN: Thank you, Commissioner. Excuse me.

COMMISSIONER WELCH: Here you go, Sir.

ATTORNEY SULLIVAN: I have these documents listed in Exhibit I.

PRESIDING COMMISSIONER FISHER: Okay, thank you.

DEPUTY DISTRICT ATTORNEY SEQUEIRA: I've received the documents as well.

PRESIDING COMMISSIONER FISHER: Okay, thank you. Will your client be speaking with us today?

ATTORNEY SULLIVAN: Yes.

PRESIDING COMMISSIONER FISHER: Okay. Mr. Kincaide, would you please raise your right hand and I'm going to swear you in.

INMATE KINCAIDE: All right.

PRESIDING COMMISSIONER FISHER: Okay. Do you solemnly swear or affirm that the testimony that you give at this hearing will be the truth and nothing but the truth?

INMATE KINCAIDE: Yes, Ma'am.

PRESIDING COMMISSIONER FISHER: All right, thank you. All right, I'm going to use the Statement of Facts from the current Board report, dated for the January '04 calendar.

ATTORNEY SULLIVAN: No objection.

PRESIDING COMMISSIONER FISHER: Okay. All right, Mr. Kincaide, I'm going to read the Statement of Facts that's in this report about the crime that you were convicted of, all right? And then I'm going to read what is the section that's called the prisoner's version. So that's where you talked about what you feel happened and then we're going to talk about that, okay? And if there's anything that you feel that we should discuss, you just let me know.

INMATE KINCAIDE: All right.

PRESIDING COMMISSIONER FISHER: All right.

C13



The summary of the crime reads, on December 17, 1983 at approximately 1930 hours, victims Mendoza and High (phonetic) were closing Mendoza's business, Wire Technology at 9527 South Worrell Street in Los Angeles. Mendoza and High were loading some office equipment into Mendoza's car. Prisoner Kincaide ran up behind High and placed a knife to her neck. High, fearing for her safety, covered her head with her jacket and was forced to the ground by Kincaide. Kincaide then searched through High's purse for money and valuables. Meanwhile, Kincaide's partner confronted Mendoza. Mendoza was unwilling to give up his money and was shot by Kincaide's partner. The bullet entered Mendoza's left eye and caused almost instant death to Mendoza. Kincaide then yelled to his partner, get his wallet, get his wallet. Victim High remained on the ground as Kincaide's partner went through victim Mendoza's pockets, removing his wallet, which contained about 600 dollars in cash as well as credit cards and identification. Kincaide's partner then confronted victim High, asking her if there was any money or a safe inside the store. While questioning High, Kincaide's partner held a gun to the cheek of High. High indicated there was no money in the store. Kincaide's partner told High he was going to kill

her and started counting to 10. Kincaide and his partner then fled the area. Victim High attempted to aid victim Mendoza but upon arrival of Paramedics at about 1940 hours, victim Mendoza was pronounced dead from a single gunshot wound. Kincaide was arrested in January of 1984. Kincaide's partner turned himself in to investigating officers in February of 1984. Now, in the section that's titled Prisoner's Version, it reads:

"I was not at the scene of the crime. I'm aware of the crime. I was aware of the crime and I know the responsible persons but they are both dead now. I'm not responsible for the murder or the robbery. I feel sorry for the victims and their families and their loss."

Does that sound right?

INMATE KINCAIDE: Yes, Ma'am.

PRESIDING COMMISSIONER FISHER: And you -- do you still contend that you were not there?

INMATE KINCAIDE: I can say -- I can say, yeah, I was there.

PRESIDING COMMISSIONER FISHER: You were there?

INMATE KINCAIDE: Yeah.



PRESIDING COMMISSIONER FISHER:  And what part did you play in it?  Did you -- did you run up behind Ms. High and put a knife at her neck?

INMATE KINCAIDE:  Yes, I did.

PRESIDING COMMISSIONER FISHER:  You did, okay.  And you searched through her purse --

INMATE KINCAIDE:  Yes, I did.

PRESIDING COMMISSIONER FISHER:  -- looking for money and valuables.

INMATE KINCAIDE:  Yes, I did.

PRESIDING COMMISSIONER FISHER:  Okay.  And what happened after that?

INMATE KINCAIDE:  After that, I just -- I was just holding her.

PRESIDING COMMISSIONER FISHER:  You were holding her.

INMATE KINCAIDE:  And the other person, my other partner, just shot the other person.  He was going to shoot her and I told him not to.

PRESIDING COMMISSIONER FISHER:  So, after Mr. Mendoza was shot, did you tell your partner to take his wallet?

INMATE KINCAIDE:  Yes, I did.

PRESIDING COMMISSIONER FISHER:  And then did your crime partner, did he go through his pockets and look for other cash and credit cards --

INMATE KINCAIDE:  Yes, he did.

PRESIDING COMMISSIONER FISHER: -- and other items? What were you doing while that was happening?

INMATE KINCAIDE: I was just holding her.

PRESIDING COMMISSIONER FISHER: You were still holding Ms. High.

INMATE KINCAIDE: And scared too at the same time.

PRESIDING COMMISSIONER FISHER: And when you found that there was no money in the store, what did you do?

INMATE KINCAIDE: We left.

PRESIDING COMMISSIONER FISHER: Where did you go?

INMATE KINCAIDE: We ran.

ATTORNEY SULLIVAN: Where did you go to?

INMATE KINCAIDE: We ran back to the projects.

PRESIDING COMMISSIONER FISHER: Did you know that at that point that Mr. Mendoza was probably mortally wounded or dying?

INMATE KINCAIDE: No, I didn't know.

PRESIDING COMMISSIONER FISHER: You didn't know.

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: Did you see where he was shot?

INMATE KINCAIDE: No. I wasn't paying attention.

PRESIDING COMMISSIONER FISHER: You weren't?

INMATE KINCAIDE: No, I wasn't.

PRESIDING COMMISSIONER FISHER: I would think that the gunshot would get your attention real quick.

INMATE KINCAIDE: I was -- I was 19. I was young. I didn't really -- wasn't paying attention.

PRESIDING COMMISSIONER FISHER: Okay.

INMATE KINCAIDE: I was scared because I thought I was going to get killed.

PRESIDING COMMISSIONER FISHER: How did you get arrested?

INMATE KINCAIDE: They caught me standing at the bus stop. I was getting ready to catch the bus.

PRESIDING COMMISSIONER FISHER: How did they know that you were the one responsible?

INMATE KINCAIDE: They had -- somebody told them.

PRESIDING COMMISSIONER FISHER: There were witnesses?

INMATE KINCAIDE: Yeah. They got on the witness stand.

PRESIDING COMMISSIONER FISHER: Other than

Ms. High?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Because she might have recognized you if she saw you but she wouldn't know who you were.

INMATE KINCAIDE: Yeah. There was other witnesses, gang members.

PRESIDING COMMISSIONER FISHER: Were they -- were they with you and your crime partner or did they happen to be in the area?

INMATE KINCAIDE: They happened to be in the area.

PRESIDING COMMISSIONER FISHER: All right. Why did you say you didn't do it?

INMATE KINCAIDE: I was scared.

PRESIDING COMMISSIONER FISHER: Were you, all right. Why do you think it's important to admit to doing it now?

INMATE KINCAIDE: I feel it was wrong. I was wrong, you know. I grew up, you know. I understand the problems. I understand what I did, you know. It was wrong.

PRESIDING COMMISSIONER FISHER: And what did your -- why did your -- why did your crime partner turn himself in?

INMATE KINCAIDE: He -- I don't know.

PRESIDING COMMISSIONER FISHER: You didn't

give them his name?

INMATE KINCAIDE: No, I didn't.

PRESIDING COMMISSIONER FISHER: Do you know what happened to him?

INMATE KINCAIDE: (Indiscernible.)

PRESIDING COMMISSIONER FISHER: Was he convicted?

INMATE KINCAIDE: Yeah. He got 25 to life. I got more than him.

PRESIDING COMMISSIONER FISHER: All right. Is there anything else about what happened at the scene of the crime that day or in connection to the crime that you would like to talk about on record, that you think it's important for us to discuss?

INMATE KINCAIDE: Not that I know of.

PRESIDING COMMISSIONER FISHER: All right. All right, then what I'm going to do is go to your prior criminal history and talk also about your social history growing up, all right?

INMATE KINCAIDE: Uh-hmm.

PRESIDING COMMISSIONER FISHER: So as I go through your prior criminal history, if there is anything that you think needs to be clarified or corrected, let me know, and we'll discuss it, all right?

INMATE KINCAIDE: Uh-hmm.

PRESIDING COMMISSIONER FISHER: We'll start

carrying a gun when you were 12?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Was it your gun?

INMATE KINCAIDE: A friend of mine.

PRESIDING COMMISSIONER FISHER: Was it -- was it a street gun?

INMATE KINCAIDE: Yeah, a gang, yeah.

PRESIDING COMMISSIONER FISHER: Were you in a gang already at that age?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Then on December 27th of 1976, there was another arrest for petty theft. It says that you were placed home on probation and that you were subsequently referred to the Department of Public Social Services for a voluntary placement. And it says that in that particular case, you took a bicycle from someone's yard.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: In 1977, in January, you were contacted and arrested again for a robbery with the use of a firearm in the commission of the crime. So at that point, you were only 13. You already had two crimes with guns by the time you were 13. Okay. It says that you were ordered on voluntary supervision and that the

case was referred to the Department of Public Social Services for a voluntary placement. Do you remember who you robbed that time when you were 13?

**INMATE KINCAIDE:** I don't remember it.

**PRESIDING COMMISSIONER FISHER:** No. May 18th of 1977, you were arrested for possession of nunchakus.

**INMATE KINCAIDE:** I was in front of my house.

**PRESIDING COMMISSIONER FISHER:** Okay. And you just -- you were arrested just for possessing the (inaudible).

**INMATE KINCAIDE:** Yeah, in front of my house.

**PRESIDING COMMISSIONER FISHER:** All right. In 1978, December, you were arrested for possession of a weapon on school grounds. What did you have that time?

**INMATE KINCAIDE:** I think I had a knife, I think. I ain't for sure.

**PRESIDING COMMISSIONER FISHER:** An eight-inch steel blade knife with a four-inch handle found hidden inside your right sock. And it says that you were declared a ward of the court at that time. In 1979 in September, you were arrested again for burglary and receiving stolen property. And then in September of 1980, it must have been --

I don't know what this was.

ATTORNEY SULLIVAN: It's possession of some kind of a weapon.

PRESIDING COMMISSIONER FISHER: It's some kind of weapon, yeah, but it doesn't -- it doesn't elaborate. So, once again, in possession of a weapon. January 15, 1981, you were arrested for annoying a child and it was reduced to a battery. What was that one?

INMATE KINCAIDE: I don't know.

PRESIDING COMMISSIONER FISHER: It says here that you attempted to rape a girl walking down the street.

INMATE KINCAIDE: No. I didn't try to do that. Somebody else tried to do that. I tried to stop it.

PRESIDING COMMISSIONER FISHER: You were trying to stop it?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: This says:

"The defendant attempted to rape the girl walking down the street, holding her and biting her on the neck until she was able to break through and go to her school, where she was able to get help and have the defendant arrested."

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: Was it --

INMATE KINCAIDE: That doesn't sound -- no.

ATTORNEY SULLIVAN: Well, what -- tell her what really happened.

INMATE KINCAIDE: I was -- I was trying to help her because there was another person snatched her blouse off the bottom of her and I told her -- I pulled him back and just told her to keep walking.

PRESIDING COMMISSIONER FISHER: Who -- why did they arrest you?

INMATE KINCAIDE: She's probably -- she's probably saying that I did it, but I didn't do it.

PRESIDING COMMISSIONER FISHER: Did they arrest the other person too?

INMATE KINCAIDE: He ran.

PRESIDING COMMISSIONER FISHER: He ran, all right. Okay, those are all of the juvenile offenses that I have here and so, we're going to start with your adult offenses. And that starts on July 23rd of 1983, there's another robbery. It says that you were convicted of petty theft and sentenced to 10 days in county jail.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Okay. In 1984, in January, this is the -- when the commitment offense was committed. So that's this

case that we just talked about. So when did you join the gang?

INMATE KINCAIDE: Probably about when I was about 15, I think.

PRESIDING COMMISSIONER FISHER: Well, wait a minute. We have a -- we have a --

INMATE KINCAIDE: What --

PRESIDING COMMISSIONER FISHER: -- crime when you were 12, where you had a firearm and you said that you --

INMATE KINCAIDE: That's when I was -- that's when I was running around but I didn't get into it until they beat me up and got me in. I was just hanging around them --

PRESIDING COMMISSIONER FISHER: Okay.

INMATE KINCAIDE: -- to get to know them.

PRESIDING COMMISSIONER FISHER: You were hanging around them to get to know them --

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: -- in spite of the fact that they were beating you up?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Okay. What made you decide that it was a good idea to join the gang?

INMATE KINCAIDE: Maybe I wanted to have somebody to look after me and stuff like that, you

know, like a father figure and stuff like that.

PRESIDING COMMISSIONER FISHER: You know, I have another arrest here in the Board report that wasn't listed on your -- on your sheet in the -- in the trial, in the legal part of your file, that says that you have an adult arrest and conviction for oral copulation and robbery while you were in jail. And sodomy while you were in jail.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: What happened with those two cases?

INMATE KINCAIDE: I think they dropped -- I think they dropped because they gave me five years in the county jail, I think, for it. When I was in there for this murder right here.

PRESIDING COMMISSIONER FISHER: Okay.

ATTORNEY SULLIVAN: The oral cop, on his rap sheet it says 20 days to county jail.

PRESIDING COMMISSIONER FISHER: Okay.

ATTORNEY SULLIVAN: It says pled guilty to 288(a), sentenced to 20 days county.

PRESIDING COMMISSIONER FISHER: All right.

ATTORNEY SULLIVAN: I think that she wasn't asking you though what the disposition was, but rather --

INMATE KINCAIDE: Oh, okay.

ATTORNEY SULLIVAN: -- why that happened.

PRESIDING COMMISSIONER FISHER: That is my question.

INMATE KINCAIDE: Uh-hmm. Yes, Ma'am.

ATTORNEY SULLIVAN: She's asking you why this happened.

PRESIDING COMMISSIONER FISHER: What happened? I mean, you were already in -- you were already in jail.

INMATE KINCAIDE: I was already incarcerated. And maybe I just -- I just felt that it was that time for me to do something, so I basically went on and did it.

PRESIDING COMMISSIONER FISHER: So you just went on and did it. Were you -- were you -- were you angry about something and you just could have -- you had the opportunity to take advantage of the situation and victimize somebody, so you went ahead and did it?

INMATE KINCAIDE: It really -- it really was -- we was together. It was like a relationship and I quit that person and then the person said I'm going to get back at you. You wait and see and stuff like that, you know, that's how that happened.

PRESIDING COMMISSIONER FISHER: All right. I must have missed that when I was going through the list before, so I wanted to make sure that we

noted that on the record. You were born in Los Angeles?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: All right. And did -- were your parents married to each other?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: Did they live together?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: And did you have contact with -- who did you live with?

INMATE KINCAIDE: My mother.

PRESIDING COMMISSIONER FISHER: Your mom. Did you -- did you have contact with your dad while you were growing up?

INMATE KINCAIDE: Yes.

PRESIDING COMMISSIONER FISHER: And do you still have contact with your parents?

INMATE KINCAIDE: My mother and father passed away.

PRESIDING COMMISSIONER FISHER: Did they, all right. It says that you had, my goodness, 10 brothers and two sisters.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: And that you grew up with them.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: And --

INMATE KINCAIDE: Some of them are stepbrothers. I've got two. There's two other brothers but one of them died, just got killed. My little brother just got killed.

PRESIDING COMMISSIONER FISHER: What happened?

INMATE KINCAIDE: Some gangs beat him up.

PRESIDING COMMISSIONER FISHER: Were your brothers in gangs?

INMATE KINCAIDE: No. He --

PRESIDING COMMISSIONER FISHER: Not even him?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: So having been in a gang, how does that -- how does that make you feel?

INMATE KINCAIDE: It don't -- it don't -- it don't -- it bothers me, you know, but you know, if he did something wrong to some of them guys out there, you know. I don't think he deserved it, but you know, I feel that it could have went somewhere different, in a different matter and stuff like that.

PRESIDING COMMISSIONER FISHER: So you think if he did something wrong, they were justified in killing him?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: You do, all right. It says here that you started using drugs when you were seven.

INMATE KINCAIDE: Yeah, my older brother showed me some drugs and stuff like that.

PRESIDING COMMISSIONER FISHER: What were you using then?

INMATE KINCAIDE: Sherm and weed and stuff like that.

PRESIDING COMMISSIONER FISHER: And that by the time you were 15, you were using things like cocaine.

INMATE KINCAIDE: No, I've never used cocaine.

PRESIDING COMMISSIONER FISHER: No?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: What kind of drugs have you used other than (indiscernible).

INMATE KINCAIDE: Drink. I drinked a little bit and stuff like that.

PRESIDING COMMISSIONER FISHER: You just drank a little bit?

INMATE KINCAIDE: Yeah, not a lot. Not a whole bunch.

PRESIDING COMMISSIONER FISHER: Do you think that had anything to do with why you had a



hard time in school?

INMATE KINCAIDE: I think so.

PRESIDING COMMISSIONER FISHER: I think so too.

ATTORNEY SULLIVAN: Did you say that your older brother gave you mushrooms?

INMATE KINCAIDE: No, not mushrooms, drugs.

ATTORNEY SULLIVAN: Just marijuana.

INMATE KINCAIDE: Yeah, marijuana and stuff like that.

ATTORNEY SULLIVAN: I just want to make sure that --

INMATE KINCAIDE: Sherm and stuff like that. Yeah, he used to smoke sherm sticks all the time and I asked him, what is that? And he'd say, do you want to smoke it and I'd say yeah and I'd take a hit of it and stuff like that.

COMMISSIONER WELCH: Aren't sherms PCP?

ATTORNEY SULLIVAN: Yeah.

INMATE KINCAIDE: Yeah.

ATTORNEY SULLIVAN: Yeah, thanks.

COMMISSIONER WELCH: Okay.

PRESIDING COMMISSIONER FISHER: Okay. And you've never been married.

INMATE KINCAIDE: I've never been married and got no kids.

PRESIDING COMMISSIONER FISHER: You have no

kids.

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: All right. And are you still in contact with your brothers and sisters?

INMATE KINCAIDE: One of my brothers. I was going to give her the phone number and address, but I forgot where I placed it at.

PRESIDING COMMISSIONER FISHER: All right. Where does he live? Does he live here in California?

INMATE KINCAIDE: Yeah. He lives in LA.

PRESIDING COMMISSIONER FISHER: All right. And does he come to visit you?

INMATE KINCAIDE: If I ask him to.

PRESIDING COMMISSIONER FISHER: All right. Is there anything else about your life growing up or your involvement in the gang that you would like to tell the Panel?

INMATE KINCAIDE: I'm not -- I'm not really gangbanging anymore. I'm getting too old for that. But really what I'm trying to do is better my life. Because if I do get out, I want to get out there and try to help young gang members that's come -- you know, is into that life. And try to back them away from that, tell them what I did and that's not the life, you know.

PRESIDING COMMISSIONER FISHER: Okay.

INMATE KINCAIDE: You know.

PRESIDING COMMISSIONER FISHER: And we're going to give you some time at the end of the hearing to talk to us about why you think that you should be found suitable. So we want you to tell us about those kinds of plans when we get to that point, okay?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: What I'm going to do now is go to your parole plans and to any letters that we have in the file. It says that if you're found suitable that you would like to reside with Norma Albert. Is that still right?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: All right. And she's your girlfriend.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Okay. She lives on South Garth Avenue in Los Angeles.

INMATE KINCAIDE: Yes, she do.

PRESIDING COMMISSIONER FISHER: Where did you meet her?

INMATE KINCAIDE: Her son was in Vaca -- he was in Vacaville, I think. He was in CMF -- no, not CMF. He was in one of them prisons.

PRESIDING COMMISSIONER FISHER: But her

son's in prison.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: All right.

INMATE KINCAIDE: He was in prison. He's out now.

PRESIDING COMMISSIONER FISHER: What did -- what was he in prison for?

INMATE KINCAIDE: For robbery.

PRESIDING COMMISSIONER FISHER: Robbery.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: One of your old favorites, huh?

INMATE KINCAIDE: Yeah. He was -- he was just only 21.

PRESIDING COMMISSIONER FISHER: Well, you were only 12.

INMATE KINCAIDE: Yeah, yeah.

PRESIDING COMMISSIONER FISHER: All right. Does she --

INMATE KINCAIDE: He was in Corcoran. He was in Corcoran with me.

PRESIDING COMMISSIONER FISHER: Okay.

INMATE KINCAIDE: That's where I met him.

PRESIDING COMMISSIONER FISHER: All right. Does she have a job?

INMATE KINCAIDE: Yeah, she do.

PRESIDING COMMISSIONER FISHER: All right.

Did -- and do we have a letter from her saying that you can come and live with her?

INMATE KINCAIDE: No, no. I can write her and tell her to send one.

PRESIDING COMMISSIONER FISHER: Yeah. That's important to do. We need to have any plans that you have for the future --

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: -- we need to have everything in writing because we can't really, you know, consider that to be a definite --

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: -- unless we have -- we know in writing that you have something that you can go to. If that -- if for some reason that didn't work out, do you have any plans for anywhere else that you might consider living or where you think that you could go live? What about your brother?

INMATE KINCAIDE: Yeah, my brother.

PRESIDING COMMISSIONER FISHER: All right, anything else?

INMATE KINCAIDE: Cousins. I've got cousins out there I can go and stay with.

PRESIDING COMMISSIONER FISHER: All right. Have you been in contact with any of your cousins?

INMATE KINCAIDE: Not recently.

PRESIDING COMMISSIONER FISHER: All right. What would you do if -- what would you do for work?

INMATE KINCAIDE: I do portraits. I draw.

PRESIDING COMMISSIONER FISHER: So --

INMATE KINCAIDE: I'm an artist.

PRESIDING COMMISSIONER FISHER: And that's what you would want to do --

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: -- when you got out?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: You know, it's not that easy to get a job as a professional artist and actually make money at it. Some people have to die before they get famous and make money from art.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: What would you do -- what would you do for a fallback if it took you awhile?

INMATE KINCAIDE: Janitorial.

PRESIDING COMMISSIONER FISHER: Janitorial?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Have you completed that here?

INMATE KINCAIDE: Yeah. I had -- I think I -- no, I think I've got my -- what do call it in

there, my certificate. I ain't for sure. I might have forgot it or I didn't bring it but I've got some certificates and stuff.

PRESIDING COMMISSIONER FISHER: Okay, good. Is there anything else you want to talk about as far as your parole plans before we go to your program?

ATTORNEY SULLIVAN: Do you want to see the portraits and stuff?

PRESIDING COMMISSIONER FISHER: Yes (inaudible). And can you -- can you just (inaudible)?

ATTORNEY SULLIVAN: Yeah.

PRESIDING COMMISSIONER FISHER: Just so I can get a better look at it. I saw it when you brought it in the room. That's very beautiful.

ATTORNEY SULLIVAN: It's nice.

PRESIDING COMMISSIONER FISHER: It's very pretty. So where would you try to get a job as an artist?

INMATE KINCAIDE: I got -- I think I got a thing on UCLA. I think it should be in my files, a UCLA -- a certificate, certification certificate for me completing that course.

PRESIDING COMMISSIONER FISHER: The course. But where would you find work?

INMATE KINCAIDE: Well, I'll just have to

go downtown to one of them places down there and see if I can fill out some forms and stuff like that.

PRESIDING COMMISSIONER FISHER: Yeah. What you might want to do if you don't receive a date today is start writing some letters to potential employers, people who might give you a job. And you keep copies of the letters that you send out to give to any of the future Boards that you might see. And also, any letters that you get back from potential employers so that, you know, that they know that you've been making an effort to find some work, okay? All right, if you don't have anything else, I'm going to have you turn your attention to Commissioner Welch and he's going to talk to you about what you've been doing since you've been here, all right?

COMMISSIONER WELCH: Okay, good afternoon, Mr. Kincaide.

INMATE KINCAIDE: Good afternoon.

COMMISSIONER WELCH: How are you?

INMATE KINCAIDE: All right.

COMMISSIONER WELCH: I'm just going to be going over your post-conviction factors. And I'll give you an opportunity as we go along to make corrections or add anything that you might deem necessary, okay, or that you want to add to. So

first of all, this is an initial parole consideration hearing. This your first -- initial means this is your first parole consideration hearing. I note that you have a classification score of 19. That's your mandatory classification score. Your actual classification score is nine, so your classification score has been coming down. The last time it was adjusted, it was on 4/15/03. It was adjusted down from 13 to nine at that time but it will actually never go any lower than 19. I want you to understand that, right?

INMATE KINCAIDE: Uh-hmm.

COMMISSIONER WELCH: Also, I note that you were a member of a disruptive group known as the Grape Street Crips.

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: Is that correct? In a review of your disciplinary history, I note that you have a total of six disciplinaries. The last one being on 2/21/02 for failure to report to work. You have another one on 6/22, 1998 for failure to report to work -- or failure to report, I believe it was school then. On 10/30, 1993 for fighting, so that's your last violent 115, was in 1993. On 3/5/90, refusing a direct order and 11/12, 1989, misrepresentation of legal mail and 10/21/88, contraband. Mr. Kincaide, you have quite a few

115s -- not 115s, I'm sorry, I said 128 write-ups. Your last 128 write-up was on February 15th, 2002 -- this is going to take a little time, okay, because you -- this is an initial hearing. I need to make sure we get it all on the record. So your last one was on February 15th, 2002, for failure to report. You have another one on 9/27, 2000 for failure to report. You have another one on 2/27, 1998 for failure to report to an educational class. One on 11 -- on 12/11, 1997 for failure to report. Another one on 8/15/97 for failure to report. Why so many absences? Why so many counseling chronos for failure to go to school?

**INMATE KINCAIDE:** Because of the -- of some of the teachers and stuff like that.

**COMMISSIONER WELCH:** Okay. Seven 28, 1997, failure to report to school, 2/24, 1997, failure to report to school, 1/8, 1997, failure to report to school, 8/17, 1992, this is failure to -- failure to perform work in the dining hall. You were part of a dining hall crew. On 6/15/92, this is non-compliance with cell inspection. In other words, your cell was inspected and it was found to be in violation of California Code of Regulation orders. So basically, I guess it's saying your cell was untidy. On 2/22, 1992, another untidy cell, 11/15, 1991, refusing to go to school. September 10,

1989, apparently you were involved in a physical altercation. And August 28, 1989, failure to perform assignment. And 30 November 1987, okay, this one says:

"On 10 -- on 11/30, 1987 at approximately 0830 hours, while conducting yard release, inmate Kincaide approached me and requested an emergency phone call, stating, I received a letter that said there was some trouble in my family. Upon requesting to the see the letter, Kincaide said, never mind, the phone call really wasn't that important after all. Inmate Kincaide admitted that no family emergency -- admitted that there was no family emergency."

Okay, those are all of your 128 write-ups. Now, on the ADA, we do note that under Adaptive Services, we note that you were diagnosed -- you were placed in D -- in a DDP-II, Developmentally Disabled, category number II. Placed in a designated DDP institution while -- with the following supplemental services: To provide staff assistant for disciplinaries, classification hearing and inmate appeals. Basically, what this is saying is that you need to be in an institution so that you

can receive assistance. It says self-care, okay. Does not read. Does not understand committee hearings. Needs staff assistance. And that -- and that has a lot to do with your educational level. So, you have to be at an institution that will offer these services, is all this chrono is saying and that's why you're here. Is that correct?

INMATE KINCAIDE: Yes, Sir.

COMMISSIONER WELCH: Okay. And this chrono is dated 7/11/01 and you are in an institution that will provide those type of services to you. I went through your file. There's quite a few chronos in your file that's noteworthy. There's a file in -- there's a chrono in your file dated 10/10/02 that notes that you're a member of the (indiscernible) -- a member of the Mental Health Delivery System at the critical -- at the Clinical Case Management Level, so they call it CCCMS. Is that correct?

INMATE KINCAIDE: Yes.

COMMISSIONER WELCH: Then there's a more informative chrono. It says in -- there's one dated February 27th, 2002. It says inmate Ken -- it says:

"Inmate Kincaide's work assignment was -- he was assigned to the Educational Department on 11/2/01. Inmate Kincaide was placed on CC status on

2/27/02 for a disciplinary."

Do you know what that means?

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: He is a D -- he is a DD-II inmate. What does that mean, that you were placed on CC status?

INMATE KINCAIDE: It's housed in the cell. You can't -- you can go to chow, but it's housed in the cell and stuff like that.

COMMISSIONER WELCH: Well, that's kind of what it -- what it actually means is that you were placed on COC status because you refused to work and you refused to participate --

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: -- in any work incentive program. When you do that, you lose all of your privileges.

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: So you lost your canteen privileges. You lost your privilege to be out of your cell during certain hours. You lost all of your privileges that you would normally receive --

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: -- because you wouldn't go to work. Why did you do that? Why did you refuse to go to work so you would be placed on

COC status?

INMATE KINCAIDE: Because of the teachers. I was having problems with the teachers and stuff.

COMMISSIONER WELCH: Was it worth it, to lose all of your privileges?

INMATE KINCAIDE: If the teacher called me an "N" word, yeah.

COMMISSIONER WELCH: Okay. Well, this is very recent. This is February -- this is recent behavior, February 27th, 2002. And you know, you're here for a parole date. If it's as recent as February of 2002, you refused to program in prison in a structured environment, how can we count on you to program and do what you're supposed to do on the outside?

INMATE KINCAIDE: Because I feel that -- I feel that I can, you know, cope better out there and stuff like that. I've been incarcerated since I was 19 and stuff like that. Now I'm understanding of doing some -- doing things as a -- as an adult, it kind of got -- it got a little better since I was -- when I was a youngster and stuff like that.

COMMISSIONER WELCH: Well, has it gotten better since February of 2002 --

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: -- of last year?

INMATE KINCAIDE: It has.

COMMISSIONER WELCH: It improved in two years?

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: Okay.

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: All right. You have another chrono here that's of note and that's from the Education Department.

"The Education Department requests that inmate Kincaide be brought before the Unit Classification Program for review. The Education Department also requested that inmate Kincaide be unassigned from the vocational Janitorial Service Program and placed in (indiscernible) C."

There again, I already told you what (indiscernible) C mean. That mean that you lose all of your privileges.

INMATE KINCAIDE: Yeah, I know.

COMMISSIONER WELCH:

"This request is based on inmate Kincaide's failure to report to his program assignment. On February 15th, 2002, inmate Kincaide received a 128(a) for failure to report. And on

February 21, 2002, inmate Kincaide received a CDC 115 for failure to report."

And I've already stated those for the record, right?

INMATE KINCAIDE: Uh-hmm.

COMMISSIONER WELCH: But you told my colleague that you had completed your Janitorial --

INMATE KINCAIDE: I completed -- I had a -- they gave me a certificate for it.

COMMISSIONER WELCH: You didn't complete it. What happened is they removed you from it because you -- you completed some components of it but you didn't complete the program yet.

INMATE KINCAIDE: No, I didn't complete the whole program. They gave me a certificate for it.

COMMISSIONER WELCH: Well, they gave you a certificate for the amount of time you had been in there. But this is the most recent thing on your Janitorial -- on your Janitorial Program. You were removed from the program because you didn't go to work. But you told my client that -- my colleague that you were going to go out and get a job in janitorial, but you didn't complete the program.

INMATE KINCAIDE: Yeah, but I know how to do janitorial work.

COMMISSIONER WELCH: Well, okay. Then we

have December 31 of 2002, inmate Kincaide's work assignment, he was assigned to the Education Department. Inmate Kincaide began receiving DDP Services. All that mean is that you're receiving the kind of help that I talked to you about early -- earlier.

"On 11/26/01, inmate Kincaide will be working on the following competency based curriculum: Whole Number Operation, Additional -- Addition, Phonics, Matching Appropriate Sounds and Letters, Social Development and Interaction, Cooperative Work Effort and Effective Group Interaction Coping Skills. He is classified for DD-II."

And we've already talked about that, right?

INMATE KINCAIDE: Uh-hmm.

COMMISSIONER WELCH: So that's when they actually put you in the program. I also noted in your file, as previously noted, that you were tested on 11/6/02. You have a total battery of one -- a grade point level of one point three. Spelling was at the KL level, so I guess that's at the kindergarten level. Level one, language is at the one point one level. Mathematics is at the two point three level and reading was at the kindergarten level, zero point level. Okay? This

is not to embarrass you. This is just --

INMATE KINCAIDE: Oh, no.

COMMISSIONER WELCH: This is just to establish the record, okay? And I don't want you to think we're trying to put you down. We're just going over what's in your record. And that's one of the reasons that you were classified for the DD-II, okay? Do you understand?

INMATE KINCAIDE: Yes, Sir.

COMMISSIONER WELCH: Okay, very good. Again, here's a chrono in here, it says that you testified -- you claim you testified against some Crips members back on 9/18/97, however he could not recall the case or the persons he testified against. That's where you were claiming that you have enemies with the Crips. Is that correct?

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: Is that something you just told them to get some attention?

INMATE KINCAIDE: In a way, yeah.

COMMISSIONER WELCH: I thought so. So you didn't really testify in open court?

INMATE KINCAIDE: No.

COMMISSIONER WELCH: Okay. All right. And here again, here's another 2002, they tested you. Back then you had a one point six. Reading level was zero. Mathematics, two point six and the

language. Here's another one. Here's an interesting chrono.

"On 10/29, 2000 -- on Saturday, October 28th, 2000, at approximately 0600 hours I was approached by inmate Kincaide, who had overheard Sergeant Cabreras, that's C-A-B-R-E-R-A-S, tell me to report to the steam line as coverage in the dining hall. And felt that it was wrong in the way -- I guess you felt that it was wrong in the way he asked me. Inmate Kincaide asked me if I wanted him to write Sergeant Cabreras up. I told Kincaide no, that it wasn't -- it was unnecessary. It should be noted that inmate Kincaide had approached me several times in the past making reference to himself regarding me as his mother."

Did you do that?

INMATE KINCAIDE: Oh, that was a long time ago, I think.

COMMISSIONER WELCH: Okay, yeah, this is in 2000.

INMATE KINCAIDE: Yeah, it was a long --

COMMISSIONER WELCH: It's not that long

ago. It says:

> "On the morning -- one morning in the Culinary he approached -- he approached Sergeant Campbell and myself and stated, if you two had been my parents, I would not be in prison today. Due to inmate Kincaide's overprotective behavior towards me, it should be noted for future reference."

And this was by Correctional Officer Montez. Did you do that?

INMATE KINCAIDE: Yes, Sir, I did.

COMMISSIONER WELCH: Why did you do that?

INMATE KINCAIDE: Because I felt that if I was -- if I would -- the way -- the way they -- the guys talked to me and stuff like that, I feel that if I was a little younger, they could have took care of me better than my parents now.

COMMISSIONER WELCH: Okay. Do you understand now that officers don't like that type of (inaudible).

INMATE KINCAIDE: Yeah. Oh, yeah, I know that now, yeah.

COMMISSIONER WELCH: Yeah. You didn't know that then?

INMATE KINCAIDE: No.

COMMISSIONER WELCH: It's only been three

years ago. Okay, I see another letter here. It says that inmate Kincaide was placed on the Narcotics Anonymous waiting list. And -- sorry.

INMATE KINCAIDE: That's all right.

COMMISSIONER WELCH: I can't say anymore until I change it.

[Thereupon, the tape was turned over.]

COMMISSIONER WELCH: Okay. We're back on record in the matter of inmate Kincaide. So what happened to the AA meetings? I don't see where you actually got any chronos. You were supposed to go. How long -- how many meetings did you actually attend?

INMATE KINCAIDE: I think I attended about three or four, I think, for sure.

COMMISSIONER WELCH: Did you learn anything?

INMATE KINCAIDE: Yeah. I learned -- I learned a few things.

COMMISSIONER WELCH: Did you learn your steps?

INMATE KINCAIDE: No, I didn't -- I didn't learn the steps because my reading wasn't that good.

COMMISSIONER WELCH: Okay. What about your memory?

INMATE KINCAIDE: My what?

COMMISSIONER WELCH: Your memory.

INMATE KINCAIDE: Not -- it's okay.

COMMISSIONER WELCH: Okay. Okay, here's another one. You were at Folsom. On 4/3/89, you were involved in a physical altercation back then. Another one, another chrono on February 20, 1989. It says:

"On February 20, 1989, at approximately 1345 hours, while performing my duty as recreation officer, inmate Kincaide, currently housed in FA-320, approached me and asked to speak to me in private. Kincaide stated, I want to commit suicide. I want to kill myself. When I asked him why he wanted to commit suicide, he stated, I have too much pressure, too many things going on. I immediately notified the program sergeant."

And subsequently, you were interviewed. Did you do that?

INMATE KINCAIDE: Yes, I did.

COMMISSIONER WELCH: Then on June -- or scratch that.

"On January 23rd, 1980, while

performing my duties as floor officer, I was informed by control -- by a control officer that there was a man down in C Section. I responded and discovered inmate Kincaide laying on the tier hallway, out of his cell. I called Kincaide but he didn't respond to me. I then told the correctional officer to call the gurney to the unit. Correctional Officer Snyder, Correctional Officer Manfield, Correctional Officers Cook, Trimble and Hill responded to the unit. Kincaide was placed on a gurney and transported the infirmary where he received medical attention."

What happened to you there?

INMATE KINCAIDE: I think I fell down.

COMMISSIONER WELCH: Then on -- is something wrong with you? You had another one just a few -- just a little bit prior to that.

ATTORNEY SULLIVAN: What was happening?

INMATE KINCAIDE: Dizziness. I stay up a lot.

COMMISSIONER WELCH: Dizziness?

INMATE KINCAIDE: I stay up and draw a lot too also, so that probably had something to do with

it too also, because I constantly draw a lot and stay with it and stuff.

COMMISSIONER WELCH: Well, here's another one. It says:

"On June 1, 1988, at approximately 1700 hours, inmate Hammond discovered inmate Kincaide on the floor of his assigned cell with blood on his face and hand. Kincaide was placed on a stretcher and transported to A Facility infirmary. MTA Johnson traded him -- treated him for multiple superficial razor incisions on his right front (indiscernible). The writer conducted an interview of Kincaide where he stated that he had cut himself because his cellie told him to find another cell to move into because his cellie was moving another inmate into his cell. And that was the only way he knew to get attention so that someone would miss him."

Is that true?

INMATE KINCAIDE: Yeah. And trying to kill myself too also.

COMMISSIONER WELCH: You were trying to kill yourself. Okay. Now, that concludes that

portion, so you do have some chronos in your file that I marked. It says that you -- Amity, that's A-M-I-T-Y, Amity Substance Abuse Program, what is that, you participated in it?

INMATE KINCAIDE: Learning how to control your anger --

COMMISSIONER WELCH: Okay.

INMATE KINCAIDE: -- and stuff like that.

COMMISSIONER WELCH: You also have a series of certificates in the file for participating in an educational program, Adult Basic Education I and II and it includes spelling, reading, phonics, those type of things. You've got one in your file (indiscernible) for Hooked on Phonics, you should be commended for that. And I did note that you received -- you took a correspondence course from UCLA in Drawing and you got a certificate on 5/10, 1988, Instructional Portrait Drawing. So we'll commend you for that, okay?

INMATE KINCAIDE: Uh-hmm.

COMMISSIONER WELCH: Now, that's your C-File. I went through everything in the C-File. Now we'll go to your Board report. You have a series of Board reports. I don't see where you completed any vocation. Is that correct?

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: So, I went through --

completely went through your C-File and I went from the time that you came in up to now. There's some Progress reports in your C-File and I looked at those and I compared them to what I'm looking at in your C-File. And I didn't see any different -- anything different, so I don't believe that we missed anything. The only vocational program, I've already noted that you were involved in was the Janitorial Program and you -- and you were removed from that because you did not attend class. Group -- apparently you took an Impulse Control Group.

INMATE KINCAIDE: Yeah.

COMMISSIONER WELCH: I do note that you participated in that in 2002, but I don't see any other self-help noted in your file. Is -- did I miss any?

INMATE KINCAIDE: No. You didn't miss any.

COMMISSIONER WELCH: Okay. Then we'll go to the correctional counselor's summary, because I think we've covered everything else he covered in the report. We got it out of the C-File. That is a J. R. Walker; Correctional Counselor I.

"Considering the commitment offense, prior criminal record, psychiatric history, prison adjustment, disciplinary history, lack of education and training, this writer

believes the prisoner would pose an unpredictable degree of risk if released from prison at this time. Prisoner Kincaide functions fairly well in the structured prison environment. Outside of a structured -- outside of a structured environment, it would be difficult to determine if the prisoner would conduct himself as a law-abiding citizen or maintain positive behavior."

That's your correctional counselor's opinion, J. R. Walker. Now, sir, do you agree with what Mr. Walker said?

**INMATE KINCAIDE:** Not really, because I believe that I can function out there.

**COMMISSIONER WELCH:** Okay, very good. So your disagreement is noted for the record, okay? So we'll go to your psychological evaluations. I believe there's two psychological evaluations in the file. Since this is an initial hearing, I'm going to have to cover both of them. The first one is from Hollingsworth, and I'll just take portions of this report. It says:

"When interviewed on this date, November 14th, 1990 in A Facility

Medical Clinic, he was found to be alert, cooperative. His memory seemed not too reliable and then there were three differences in -- there were difficulties in doing sampling -- simple intellectual tests. There were -- there was not thought to be any psycho -- psychiatric or psychotic process or effects in disturbance present at this time. Antisocial Personality Disorder was a 30 point 70."

Conclusion:

"There is a (indiscernible) pattern of behavior throughout adolescence which did result in the present life crime commitment. He continued to possess -- profess his innocence of this crime. Remedial education seems indicated along with some type of vocational training. There was not thought to be any need for psychiatric treatment at this time."

And the most recent psychological evaluation was completed by a Dr. Gary Collins and it was completed on 10/7/03. The doctor writes:

"Mr. Kincaide is a Clinical Case

Management inmate who attends school and in Post-control, a mood -- a mood control and a Arts and Corrections group. Sometimes he leaves a group early and complains of headaches or feeling poorly. His speech has been unpredicted -- unproductive and his affect has been blunted."

He writes:

"The past psychiatric diagnosis includes Psychotic Disorder, NOS, in partial remission, Alcohol Dependency. Axis II, Borderline Intellectual Functioning."

Current Status and Treatment Needs:

"There is no information regarding mental status, other than the notes of the Case Manger in October of 2003, May of 2003 and August of 2003. He continues to participate in education and treatment activities of the CCCMS Program."

Diagnosis: Axis I, Psychotic, NOS, in remission, Axis II, Antisocial Personality Disorder, Mild Mental Retardation, Axis III, none in medical file, Axis IV, incarceration, Axis V, 55. The doctor writes:

"He has been diagnosed as experiencing a psychotic disorder but has apparently recovered, correlated modestly and with recidivism. His case manager has described him as well motivated and stable (indiscernible) and correlate the negative with the real facts. He have participated in Impulse Control and Mood Control discussion groups and may have learned to be less violent. That he has 19 classification points as of September 15th, 2003, indicates that he has not been violent in prison for several years. Lack of family support and employment skills are serious future oriented risk factors if Mr. Kincaide were to parole. Mr. Kincaide will require a structured living situation, plus parole supervision and government financial assistance if he is paroled. He appears to have a moderate possibility of re-offending within seven years of release from prison if he receives guidance and assistance. Lack of social and financial assistance would be serious

destabilizing conditions for Mr. Kincaide if he paroled -- if he were to parole."

And that's it. Now, I've covered your two psych reports, I've covered your C-File. Is there anything that you or your attorney would like to add before we go and return to the Chairperson?

ATTORNEY SULLIVAN: No.

COMMISSIONER WELCH: Did we cover everything, Counselor?

ATTORNEY SULLIVAN: Yes.

COMMISSIONER WELCH: Okay. Return to the Chairperson.

PRESIDING COMMISSIONER FISHER: There are a couple of things, Mr. Kincaide. When you were testifying, it says here that you identified the perpetrators as Corelle (phonetic) Johnson and Ronnie (indiscernible). And asserted that Corelle had announced that he was going to kill Mendoza, who was his boss, because he got fired from his job and Mendoza didn't want to give him money. Were those two of your fellow gang members?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Did they -- did one of them or both of them work for Mendoza?

INMATE KINCAIDE: One of them did.

PRESIDING COMMISSIONER FISHER: And did he

all right. I'm talking about they, they being the victims, they were picked ahead of time.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: Because someone that you knew in the gang worked for Mr. Mendoza, is that correct?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER FISHER: All right. Now, also Ms. High said that you grabbed her violently and thrust what she believed to be a knife against her neck. And then it says you instructed her to lie down and be quiet and demanded her money. And then she said that you raised her blouse and lowered her slacks and began to feel her body. Did you do that?

INMATE KINCAIDE: Actually, yeah.

PRESIDING COMMISSIONER FISHER: And Mr. Mendoza told you to take your hands off of her.

INMATE KINCAIDE: He didn't -- I didn't hear that.

PRESIDING COMMISSIONER FISHER: You didn't hear that?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: So tell me what you think about what you did and how you think it affected those people's lives?

INMATE KINCAIDE: Like I said, I think it

PRESIDING COMMISSIONER FISHER: And do you feel that it was justified? Do you feel like it was --

ATTORNEY SULLIVAN: Do you think it was okay?

PRESIDING COMMISSIONER FISHER: -- it was okay --

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: -- for them to do it?

INMATE KINCAIDE: It wasn't okay for him to do that.

PRESIDING COMMISSIONER FISHER: Because you said earlier that you felt like it was probably okay for the gang to retaliate against your brother if they'd done -- if he'd done something wrong. What's different?

INMATE KINCAIDE: I feel if my brother was joining the gang or he just did something out of the ordinary, they seen something he did that wasn't right, you know.

PRESIDING COMMISSIONER FISHER: So there are some things that people might do that are -- that make it okay for gang members to take their lives?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER FISHER: All right.

65

Any questions, Commissioner?

COMMISSIONER WELCH: I don't think so.

PRESIDING COMMISSIONER FISHER: All right. Mr. Sequeira?

DEPUTY DISTRICT ATTORNEY SEQUEIRA: I have no questions.

PRESIDING COMMISSIONER FISHER: Counselor?

ATTORNEY SULLIVAN: No questions.

PRESIDING COMMISSIONER FISHER: All right. Mr. Sequeira, would you like to go to closing?

DEPUTY DISTRICT ATTORNEY SEQUEIRA: Thank you. I would ask the Panel to find the inmate unsuitable for parole at this time for a variety of reasons. First of all, the life crime itself is extremely cold blooded. It was obviously a retaliation against the victim firing one of the defendant's homeboys from employment at his business. Additionally, this inmate knew exactly what was going to happen. He knew he was going to be killed. I think he also took advantage of the situation by terrorizing Ms. High and according to testimony from Ms. High, also began to sexually assault her. Although, apparently that didn't materialize any further then pulling off -- pulling her clothes down and touching her. This fits in with his pattern of behavior, which included a number of other violence-related offenses and also

sexual assault arrests. His performance while in custody has also been fairly poor with a number of CDC 115s and 128s. I think when looking at the totality of the situation with respect to Mr. Kincaide, that this should be a multiple year denial. Submit it.

PRESIDING COMMISSIONER FISHER: Thank you. Ms. Sullivan.

ATTORNEY SULLIVAN: Thank you. I think that Mr. Kincaide made a breakthrough today because he admitted to his culpability in the crime. And that is a positive step, that hopefully Mr. Kincaide is going to be able to take and move forward with in terms of understanding, having some insight into what's happened here. His age of 40 argues against recidivism. Institutionally, he has been in a substance abuse program that included -- I didn't really understand the Anger Management inclusion in the Substance Abuse, but personally, I understand that that can be a nexus, so it makes sense that that may have been a part of it and Impulse Control. Also, I think that given the fact that Mr. Kincaide is illiterate, that he should be commended for participating in the educational programs, including ABE I, II, and Hooked on Phonics. And finally, I think his portraits show that he does have some creativity that can be put

to good use. Thank you.

PRESIDING COMMISSIONER FISHER: All right, Mr. Kincaide, now is your opportunity if you would like to tell the Board why you believe you should be found suitable. Or if you would prefer, you can just rest on what your attorney has said for you.

INMATE KINCAIDE: I feel that -- like I said, I feel that, you know, I need to get a chance, you know. Like, that I was -- like I said, I was young, you know. But I've grown up, you know, I've grown. You know, I've learned from a lot of stuff over the years since I've been down and stuff like that and I've seen a lot. And you know, now it's time for me to do something that is right. Do something that I can give back to the community when I -- whenever I do get out there and stuff like that. You know, it's time for me to show other young gang members that, you know, they can come up out of that. You know, they don't have to do what they're doing. They ain't got the power behind all the original gangbangers or whatever and stuff like that. You know, I feel that their life is headed in the wrong direction like mine got headed in the wrong direction, you know. I was -- like I was a youngster, you know. And you know, what more can I say, you know, like that. You know, it took 21 years of my life, you know. I

C68

took 21 years of my life for getting in gangs and showing that I can do this one and I can do that. Like I said, now it's time for me to get out there and be a, you know, productive citizen, you know, and show them out there that I can stay out there. I ain't got to go run back to no gangs or be -- show them youngsters that, oh, I'm out here, I can do the same too, and stuff like that. And you all can go to prisons and do this and do that. I'm not with that no more. Like I said, it's time for me to straighten out my life and I've done that, you know. I don't -- I don't gangbang no more. I don't go around, you now, beating up on people no more. I don't -- I don't do that, you know and that's -- I've straightened up my life, you know.

PRESIDING COMMISSIONER FISHER: Okay, thank you, sir, for your comments. We're going to recess for deliberations and we'll have you come back in when we've made our decision, okay?

INMATE KINCAIDE: Okay.

ATTORNEY SULLIVAN: Thank you.

R E C E S S

--o0o--

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

PRESIDING COMMISSIONER WELCH: We're back on record in the matter of Mr. Kincaide.

PRESIDING COMMISSIONER FISHER: It's 2:15. I'd like to note for the record that everyone who was in the room previously and identified themselves is back in the room. Mr. Kincaide, the Panel reviewed all of the information received from the public and relied on the following circumstances in concluding that you're not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Certainly the first thing that we looked at was the commitment offense. The offense was carried out in an especially cruel manner. Multiple victims were attacked. Mr. Mendoza died. Mrs. -- Ms. High was terrorized and fondled during the attack. The motive for the crime was very trivial, in that apparently one of your fellow gang members had been fired from Mr. Mendoza's business and so they were targeted as future victims in this crime. These conclusions are drawn from the Statement of Facts, wherein the prisoner and his crime partner accosted Mr. Mendoza and Ms. High as they were closing

EUGENE KINCAIDE D-64290 DECISION PAGE 1 4/22/04

Mr. Mendoza's business in Los Angeles. Ms. High covered her head with her -- with her coat, but the inmate put a knife against her throat and proceeded then, as she testified later, to raise her blouse and lower her slacks and fondle her body after telling her to lie down and be quiet. While he was terrorizing her, his crime partner confronted Mr. Mendoza and tried to take his money. And when he wouldn't give up his money, he was shot through the left eye and died almost instantly. This inmate has a significant previous record. His first arrest was for burglary at the age of 12. He had a significant juvenile record that included, in 1981, essentially an attempted rape. He was charged with annoying a child and it was reduced to a 242, battery. But if we note, it's noted that he attempted to rape a girl walking down the street, holding her and biting her on the neck until she was able to get away. The inmate has said that he didn't do it, that he was trying to help her. But apparently the victim identified him. He has a history of unstable relationships with others, in that he was a gang member and he was victimizing people from the time he was at least 12 years old. We noted that he started abusing drugs at the age of seven, with the help of a brother. Previously

**EUGENE KINCAIDE    D-64290    DECISION PAGE 2    4/22/04**

accused of a sexual assault on another victim, this girl walking to school, and has failed to profit from society's previous attempts to correct his criminality. He certainly had a lot of contacts with the police as a juvenile and was contacted by Social Services for voluntary placement time and time again. He did time in county jail as an adult and continued to commit crimes up until this commitment offense. As far as his institutional behavior, he has failed -- he's limited in a -- programmed in a limited way while he's been incarcerated. He failed to upgrade vocationally, in that he started the Janitorial Program but didn't complete it and noted during conversation today that he felt that he didn't need to because he knows how to do janitorial work. We also would like to note that while Mr. Kincaide has some learning disabilities and we don't know, certainly the Board members are not qualified to know to what degree he can upgrade educationally, that he needs to do as much as he is capable of doing. Any classes that are available that you feel that you can participate in, Mr. Kincaide, that would help to equip you for being back on the outside, we feel that you should take advantage of and try to educate yourself as much as you possibly can.

EUGENE KINCAIDE D-64290 DECISION PAGE 3 4/22/04

During the course of your commitment, you've had 13 128 counseling chronos, the last one being in 2002 for failure to report to work. And six 115 disciplinary reports, the last one being 2/21/02, also for failure to report. The psychiatric evaluation, dated 10/7/03, by Dr. Collins is unfavorable, in that under Comments and Recommendations, Dr. Collins states that:

"Mr. Kincaide will require a structured living situation, plus parole supervision and government financial assistance if he is paroled. He appears to have a moderate probability of re-offense within several years of release from prison, if he receives guidance and assistance. Lack of social and financial assistance would be serious destabilizing conditions for Mr. Kincaide if he were to parole."

He also notes in the previous section titled Assessment of Dangerousness that he has been antisocial for much of his life and engaged in fights during his early years in prison. And also that he has a lack of employment skills that are serious future oriented risk factors if he were --

EUGENE KINCAIDE    D-64290    DECISION PAGE 4    4/22/04

if he were to parole. His -- he -- the prisoner has parole plans, in that he has a place that he can go to live. He also mentioned that if his girlfriend's situation didn't work out, that he could probably live with his brother. But there are no -- there's no indication in the file that that -- that he's talked to his brother about it or that that would be all right with his brother. He also does not have acceptable employment plans, in that although you're clearly talented in the area of art, that's a very difficult area to support yourself. And since you haven't completed a vocation, you really don't have any kind of acceptable employment plans. So, once again, you need to get that janitorial vocation completed or other vocations that you have available to get involved in here. In response to the 3042 notices, the District Attorney of Los Angeles County has had a representative appear today in opposition to a finding of suitability at this time. The Panel makes the following findings: The prisoner needs to continue to participate in self-help in order to face, discuss, understand and cope with stress in a nondestructive manner. The prisoner also, I believe, needs to participate in self-help in order to really gain some insight into the commitment

**EUGENE KINCAIDE  D-64290  DECISION PAGE 5  4/22/04**

offense. And not just the commitment offense but also into his prior life of crime. One of the things that you said a couple of times here today, Mr. Kincaide, that troubles me was that you seem to feel that there are certain circumstances in which gang members are justified in taking action, violent action against people. And you seemed a little confused when I asked you about it later in the hearing. But there were -- there were a couple of times where I asked you specifically, do you think that if people did things to cross the gang, that they -- that it was okay for them to then retaliate against the person that crossed them. And you indicated that you did, under certain circumstances, think that that was okay. In view of the prisoner's assaultive history, continued negative behavior, in that he has been not cooperating with teachers and in work, there's no indication that the prisoner would behave differently if paroled. We would like to commend you today, Mr. Kincaide, for finally admitting your part in this crime. That's important. Especially, as I said before, today sets the foundation for any future hearings. So the fact that you came -- you came clean with your part in this crime today, I think will help you move forward in the future when

EUGENE KINCAIDE   D-64290   DECISION PAGE 6   4/22/04

you're working with other Board members. We would also like to commend you for your work in the area of art. You're obviously very talented and I hope that you'll continue to work on that. However, these positive aspects of his behavior do not outweigh the factors of unsuitability. In a separate decision, the hearing Panel finds that it's not reasonable to expect that parole would be granted at a hearing during the following four years. Specific -- the specific reasons for this finding are as follows: The prisoner committed the offense in an especially cruel manner. Multiple victims were attacked. Ms. High was abused. Mr. Mendoza was murdered. The offense was carried out in a manner that demonstrates an exceptional -- exceptionally callous disregard for human suffering. And the motive for the crime was very trivial in relation to the offense. Mr. Mendoza lost his life because he fired one of your fellow gang members. And Ms. Mendoza [sic] was terrorized and assaulted because she happened to be with him when she left the building. The prisoner has a prior record of violent behavior, in that as a juvenile, in 1981, he was arrested for attempting to rape a girl who was walking down the street. The prisoner has an extensive history of

EUGENE KINCAIDE   D-64290   DECISION PAGE 7 4/22/04

criminality and misconduct, including numerous crimes as a juvenile that included the use of a weapon or possession of a weapon. And several -- at least two prior arrests as an adult and a history of participating in gang activities and carrying weapons. Once again, the prisoner has a history of unstable relationships with others, in that he became a gang member at the age, he said of about 12 or 15. He was -- he said that he was hanging out with the gang, getting to know them at age 12, and by 15, he was a gang member. And during that period of time was already starting to commit crimes against other people. The prisoner recently committed a serious disciplinary violation. It was back in 2002, but it was -- that's fairly recent when you consider that this is your initial hearing and that you have a real history here of failure to report. You have 13 128s over the period of time that you've been here, with a 128 in 2002 and also a 115 in 2002, also for failure to report. A recent psychiatric evaluation, dated 10/7/03, by Dr. Collins was not totally supportive of the inmate's release. And the prisoner has not completed the necessary programming that's essential to his adjustment and needs additional time to gain such programming.

EUGENE KINCAIDE D-64290 DECISION PAGE 8 4/22/04

And in particular, that means to complete a vocation. And once again, we would like to see you participate in any educational programs that are available to you, that you feel that you could participate in, in a meaningful way. And help to upgrade your education so that when you're out of prison, you're able to take care of yourself in a meaningful way. We also feel that the prisoner has failed to participate in self-help, to the degree that he needs to, in order to gain some insight into this commitment offense and also into his prior life, starting at the age of 12 and participating in gang activities and victimizing other people. Therefore, a longer period of evaluation -- of observation or evaluation of the prisoner is required before the Board should find that the prisoner is suitable for parole. The Panel recommends that the prisoner become and remain disciplinary free. If and when available, upgrade vocationally and as well as educationally, to the degree that you're able. And if and when available, continue to participate in self-help programs. This completes the reading of the decision. Commissioner, do you have any comments?

COMMISSIONER WELCH: Just good luck to you, sir.

EUGENE KINCAIDE  D-64290  DECISION PAGE 9  4/22/04

PRESIDING COMMISSIONER FISHER: We wish you well, Mr. Kincaide, and this hearing is concluded.

ATTORNEY SULLIVAN: Thank you.

PRESIDING COMMISSIONER FISHER: It's 2:29.

ATTORNEY SULLIVAN: Do you have his copy?

COMMISSIONER WELCH: Sure.

ATTORNEY SULLIVAN: In four years.

INMATE KINCAIDE: Four years? So that should make it (inaudible).

ATTORNEY SULLIVAN: No, in 2008.

INMATE KINCAIDE: Two thousand and eight?

PRESIDING COMMISSIONER FISHER: Here's the --

COMMISSIONER WELCH: Thank you.

ATTORNEY SULLIVAN: Thanks.

--oOo--

PAROLE DENIED FOUR YEARS

THIS DECISION WILL BE FINAL ON: _____AUG 2 0 2004_____.

YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.

EUGENE KINCAIDE    D-64290    DECISION PAGE 10    4/22/04

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 79, and which recording was duly recorded at CALIFORNIA MEDICAL FACILITY at VACAVILLE, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of EUGENE KINCAIDE, CDC No. D-64290, on APRIL 22nd, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am à disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 6th, 2004, at Sacramento County, California.

_____
Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT

## "D"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

MAY 2 1 2009

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )      CDC Number D-64290
                           )
EUGENE KINCAIDE            )
_____)

INMATE
COPY

CALIFORNIA MEDICAL FACILITY

VALLEJO, CALIFORNIA

APRIL 16, 2009

11:12 A.M.

PANEL PRESENT:

Michael Prizmich, Presiding Commissioner
Robert Harmon, Deputy Commissioner

OTHERS PRESENT:

Eugene Kincaide, Inmate
John Stringer, Attorney for Inmate
Alexis Delagarza, Deputy District Attorney
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

JEANNIE MOORS

FOOTHILL TRANSCRIPTION COMPANY, INC.

D1

# INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 17 |
| Pre-Commitment Factors | 20 |
| Post-Commitment Factors | 30 |
| Parole Plans | 52 |
| Closing Statements | 64 |
| Recess | 71 |
| Decision | 72 |
| Adjournment | 79 |
| Transcriber Certification | 80 |

--oOo--

D2

**P R O C E E D I N G S**

**DEPUTY COMMISSIONER HARMON:** You're on record.

**PRESIDING COMMISSIONER PRIZMICH:** All right. I'm on record. This is a Subsequent number one Parole Consideration for Eugene Kincaide, CDC number D-64290. Today's date is 4/16/09 and the time is 11:12. The location of this hearing is CMF. The inmate was received on 8/18/87 committed from Los Angeles County. Life term began on 1/27/88. Minimum eligible parole date is 2/4/05. Controlling offense for which the inmate has been committed is set forth in case number A as in Adam, 460850 charging in Count One a violation of Penal Code Section 187, Murder in the First Degree. Other counts for which the inmate committed are set forth as follows: Penal Code Section 12022A, Armed with a Firearm and Penal Code Section 211, Robbery. The inmate received a term of 25 years to life with 6 years of enhancements totally 31 years to life. The victims in this case are William Mendoza, M-E-N-D-O-Z-A, and Marilyn High, H-I-G-H. Mr. Kincaide, this hearing is being tape recorded and the first thing we'll do, sir, is go around the room and introduce ourselves. The way that will work is I'll start with myself and I'll introduce myself by stating my first and last name then I'll spell my last name, sir. When I done, I'll move to my right which will be to your

left. Mr. Harmon will introduce himself. We'll then continue around the table to the lady at the end of the table. She is a Deputy District Attorney with the County of Los Angeles. She'll then introduce herself. We'll then go to your attorney and he'll introduce himself and then we'll end with you, sir. If you could introduce yourself when your time comes by saying your first name, say your last name, spell your last name, and also give us your CDC number, we'd appreciate that. We have two correctional officers in the room but they're here for security purposes only. So with that, let me get started. My name is Mike Prizmich, P-R-I-Z-M-I-C-H, Presiding Commissioner.

**DEPUTY COMMISSIONER HARMON:** And Robert Harmon, H-A-R-M-O-N, Deputy Commissioner.

**DEPUTY DISTRICT ATTORNEY DELAGARZA:** Alexis Delagarza, DELAGARZA, Deputy District Attorney, Los Angeles County.

**ATTORNEY STRINGER:** John Stringer, S-T-R-I-N-G-E-R, attorney.

**INMATE KINCAIDE:** My name is Eugene Kincaide, D-64290.

**PRESIDING COMMISSIONER PRIZMICH:** Mr. Kincaide, can I get you to spell your last name please?

**INMATE KINCAIDE:** K-I-N-C-A-I-D-E.

D4

PRESIDING COMMISSIONER PRIZMICH: Thank you, sir. The next thing I want to do is make sure if there's any disability or need you have that we've taken care of that, we've attended to it if we can. Now, the way I find out about that is to look in the file and then I'll ask you some questions. Under the form 1073, you signed that on 10/17/08 and it looks as though the items that you have marked here is you're currently being cared for under Triple CMS. Is that correct?

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: Are you taking medication too, sir?

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: No medication. You're just talking to the doctor?

INMATE KINCAIDE: Yeah. Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: Okay. What about every 90 days or something like that?

INMATE KINCAIDE: Every 90 days.

PRESIDING COMMISSIONER PRIZMICH: Okay. And then you have a developmental disability. I'm not sure what that is. What -- do you have trouble just reading?

INMATE KINCAIDE: Understanding, reading, and stuff like that.

PRESIDING COMMISSIONER PRIZMICH: Oh, okay. And



4

it does say here that, you know, we -- that you do have some problems understanding. How is that we can help you on understanding? Do you -- can you -- if you don't understand some words.

INMATE KINCAIDE: Have it explained for me.

PRESIDING COMMISSIONER PRIZMICH: Yeah. Okay. You can ask him or you can ask. You just tell us. I mean if I ask you a question like whatever and you don't understand it, make sure you say, you know, sir, I don't -- you know, I don't understand what you're saying.

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: And you know, so we'll ask you to do that, okay?

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: All right. But I don't see anything else in here. There is no other problems that you have that we need to hear about. You wish that we speak in clear, simple English, which is always best. All right.

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: That's always easier to understand. Anything else that we need to hear about that you -- any problems that you may not --

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: -- let me just

make sure by asking you some questions. Do you have any difficulty walking at all?

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: All right. Do you have any difficulty hearing?

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: All right. And do you need glasses for anything? Do you have --

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: -- you don't.

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER PRIZMICH: How is that?

INMATE KINCAIDE: I can see real well.

PRESIDING COMMISSIONER PRIZMICH: Really. Okay. You have -- before getting to prison, how far did you get in school?

INMATE KINCAIDE: 10th.

PRESIDING COMMISSIONER PRIZMICH: 10th grade.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: When you were in school, did you take any special education classes?

INMATE KINCAIDE: Special education.

PRESIDING COMMISSIONER PRIZMICH: Okay. What were they for? Do you remember?

INMATE KINCAIDE: Reading. Reading and writing.

PRESIDING COMMISSIONER PRIZMICH: So you were behind in some ways and they were giving you a slower pace to help you catch up?

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: All right. Now how come you got out in 10th grade? What did you do? You start jacking and jerking and doing your thing?

INMATE KINCAIDE: Yeah. I got off into something that I shouldn't have been gotten off into [sic].

PRESIDING COMMISSIONER PRIZMICH: All right. Well we'll get into that a little later. Okay. They didn't move you out. You went and did something.

INMATE KINCAIDE: I quit.

PRESIDING COMMISSIONER PRIZMICH: All right.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: All right. Is there any disability that I may not have mentioned that we need to hear about here that we can help you with?

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: Okay. Mr. Stringer, does it appear as though your client's ADA rights have been met as best as you can determine, sir?

INMATE KINCAIDE: They have, Commissioner.

PRESIDING COMMISSIONER PRIZMICH: All right. I want to make sure that you understand what rights you



have to this hearing. Now, see -- your TABE score shows that your reading level 1.9 and grade point 1.4. Was it ever higher than that, the TABE score?

**INMATE KINCAIDE:** No, not really. No.

**PRESIDING COMMISSIONER PRIZMICH:** Really? Did you try when you did the --

**INMATE KINCAIDE:** Yeah. I tried. Yeah.

**PRESIDING COMMISSIONER PRIZMICH:** -- you just can't grasp it, huh?

**INMATE KINCAIDE:** No. I can't grasp it.

**PRESIDING COMMISSIONER PRIZMICH:** All right. Okay. Well, we're going to make sure that you understand your rights to this hearing and again, I'll look in the file under the 1002 and you signed that on October, it looks like 2008. Now that's a several page form that talks about what rights you have to this hearing. You signed it stating that you understand what your rights are. Do you have any question about what they are today?

**INMATE KINCAIDE:** No, sir.

**PRESIDING COMMISSIONER PRIZMICH:** All right. Let me describe the hearing process. The hearing will be conducted in two phases. The first phase will be myself and the Commissioner will be reading into the record various items and then we'll invite you to answer questions about what we've read into the record. For

D9

example, I'll be reading into the record the statement of facts which is the statement about the crime itself and then we'll invite you to answer questions about that. We'll be going over your prior criminal history. We'll be covering your institutional behavior. We'll be going over your parole plans, letters of support or opposition that may be in your file. We'll be covering your counselor's report and your psychological evaluation. Each step along the way, sir, we'll be asking you questions for clarification. When we're done with that portion of the hearing, we will provide the District Attorney from Los Angeles an opportunity to ask you questions and the way that works is she'll ask me the questions and then I'll ask you and then you'll respond back to me.

INMATE KINCAIDE: Uh-huh.

PRESIDING COMMISSIONER PRIZMICH: So I'll filter her questions to some degree. Once she is done -- I bet you're glad you're wearing those shirts today, huh? It's nice and warm in here, huh?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Yeah.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Once she is done, we'll go to your attorney. He'll ask you questions

D/0

but he'll ask you questions directly, okay? Once that's done, we return to the DA. She'll make a closing statement. Your attorney will make a closing statement then we'll go to you. And you'll be given an opportunity to make a closing statement. Now at the end of the hearing, your closing statement should be directed at why you feel you're suitable for parole, okay?

**INMATE KINCAIDE:** Uh-huh.

**PRESIDING COMMISSIONER PRIZMICH:** Do you understand the process?

**INMATE KINCAIDE:** Yes, sir.

**PRESIDING COMMISSIONER PRIZMICH:** All right. Now let me tell you sir, I mentioned that we're going to be reading into the record the Statement of Facts which is the statement about the crime and we'll invite you to answer questions about that. Now, let me just explain a little bit about that. We're not trying to retry the case in that portion of the hearing. We're going to accept what the court found as true and accurate. The reason we read it into the record and the reason we ask you questions about it is that is it one of the components that we use to help us reach a decision regarding your suitability for parole. Now, you don't have to talk to us about the crime if you don't wish to. That's between you and your attorney. I want you to

understand that. Nor or are you required to admit to the crime if you don't wish to. If you chose not to talk about the crime even though it's one of the components that we use to help us reach a decision on your suitability, we'll try to find some other means of making that determination for you, okay? You have three rights. Those rights include the right to a timely notice of this hearing, the right to present relevant documents. I see you've got a whole bunch of pictures there that you're probably going to share with us, huh?

INMATE KINCAIDE: Yeah. I've got drawings and stuff like that (inaudible).

PRESIDING COMMISSIONER PRIZMICH: Oh good. Oh, so you're an artist. Okay. Good. We'll look at those. We'll be happy to look at those. And the right to be heard by an impartial panel. Today, the Panel consists of myself, Mike Prizmich and Mr. Harmon. We're the two individuals who'll be making a decision regarding your suitability. And I'll ask you first then I'll ask Mr. Stringer. Do you have an objection to the Panel, sir?

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: Mr. Stringer, do you have an objection to the Panel?

ATTORNEY STRINGER: I do not, Commissioner.

PRESIDING COMMISSIONER PRIZMICH: All right. Now,

are there -- and I know there are -- are there additional documents to be submitted here today?

ATTORNEY STRINGER:  There are, Commissioner.

PRESIDING COMMISSIONER PRIZMICH:  All right.

ATTORNEY STRINGER:  We would submit samples of my client's --

PRESIDING COMMISSIONER PRIZMICH:  Could you give that to one of the officers?  There you go.

ATTORNEY STRINGER:  -- artistic ability.  We would also submit some additional letters of support.

PRESIDING COMMISSIONER PRIZMICH:  Okay.

ATTORNEY STRINGER:  A picture concerning parole plans and his participation in Cairo, some additional pictures and several letters of people that are in support of my client.

PRESIDING COMMISSIONER PRIZMICH:  Okay.

ATTORNEY STRINGER:  We also reserve the right to supplement the record if the occasion arises.

PRESIDING COMMISSIONER PRIZMICH:  Absolutely.  All right.  Thank you very much.  Okay.  There's a lot of pictures, huh.  Okie-doke.  Good job. (inaudible).  That's tough.  Tough work.

ATTORNEY STRINGER:  And there's several other renderings in this --

PRESIDING COMMISSIONER PRIZMICH:  Yeah.

D13

ATTORNEY STRINGER: -- folder too.

PRESIDING COMMISSIONER PRIZMICH: Okay. Those are pen and ink or pencil and ink?

INMATE KINCAIDE: Pencil.

PRESIDING COMMISSIONER PRIZMICH: Pencil and ink. All right. Anything else, sir?

ATTORNEY STRINGER: No, Commissioner. Thank you.

PRESIDING COMMISSIONER PRIZMICH: Are there any preliminary objections, sir?

ATTORNEY STRINGER: Just one, Commissioner.

PRESIDING COMMISSIONER PRIZMICH: All right.

ATTORNEY STRINGER: That is my standard Proposition 9, Marsy's Law objection. My client came into the Department of Corrections prior to the passage of Marsy's Law by the California voters. It's our position that that law cannot be retroactively applied to Mr. Kincaide because it violates provisions of the California and Federal Constitutions, specifically the ex post facto clauses of both documents so we would object to having this hearing under the auspices of Marsy's Law, aka, Prop 9.

PRESIDING COMMISSIONER PRIZMICH: Thank you Mr. Stringer. Now let me talk a little bit about that objection. Proposition 9 is a new law -- actually it's not brand new but it's a relatively new law. Your

attorney in raising this issue concerning how we are making decisions here today because it's affected by Marsy's Law. And I'm going to overrule his objection. We're going to go forward with the Proposition 9 as we understand it because we believe that's the stated law. That is, this Panel believes that. What your attorney has done is he's preserved for you any rights that you may have should it get overturned or changed in any way. But I want you to understand, we're moving forward with Marsy's Law but your rights have been preserved. Okay? Anything else, sir?

**ATTORNEY STRINGER:** Ready to proceed.

**PRESIDING COMMISSIONER PRIZMICH:** All right. Will your client be speaking with the Panel today, sir?

**ATTORNEY STRINGER:** Commissioner, I'm going to invoke my client's right under 5011B of the Penal Code and instruct him not to discuss the life crime and further, we will stipulate to the record about any juvenile or adult record that may be contained in the reports.

**PRESIDING COMMISSIONER PRIZMICH:** Okay. Well, we are not going to hold that against you. That is the fact that you choose not to speak about the crime and we will not be asking any questions about -- which I think is what you're saying -- the record. The criminal record.

ATTORNEY STRINGER: Yes, Commissioner.

PRESIDING COMMISSIONER PRIZMICH: Okay. We won't ask in those areas. We are going to talk to you about some other things, though. So to do that, we're going to need to swear you in. So if you could raise your right hand, I'll give you the oath. Sir, do you solemnly swear or affirm the testimony you're about to give at today's hearing will be the truth, the whole truth and nothing but the truth?

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: Thank you. All right. I'm going to share with your attorney, Mr. Kincaide, a form. Could you give this to -- the form 1008 -- thank you -- and he's going to share that with the DA once he's looked at it. We're just making sure. This is one way of finding out he's got the same documents we do and then we'll share it with the DA and she'll look at it as well.

ATTORNEY STRINGER: The defense has those documents.

PRESIDING COMMISSIONER PRIZMICH: Thank you, sir.

DEPUTY DISTRICT ATTORNEY DELAGARZA: Thank you. I also have the documents.

PRESIDING COMMISSIONER PRIZMICH: Thank you. And now for everyone concerned, you just witnessed the only

D16

time I will get up in the hearing. How do you like that? Pretty good. All right. So we'll mark this in as Exhibit Number 1. Unless you do something, then I may get up in the hearing on that.

INMATE KINCAIDE: No, I ain't going to do nothing.

PRESIDING COMMISSIONER PRIZMICH: These guys get all worked up.

INMATE KINCAIDE: I don't want them to get worked up.

PRESIDING COMMISSIONER PRIZMICH: All right. All right. All right, we do have some letters here I want to make sure everybody has. A letter from Lewis Wright (phonetic). Looks like it has to do with parole plans for Mr. Kincaide. It's from -- it's got a letterhead of Catargeo, Inc. (phonetic). I don't know. C-A-T-A-R-G-E-O. What is that?

ATTORNEY STRINGER: Was that Catargeo?

INMATE KINCAIDE: Catargeo.

PRESIDING COMMISSIONER PRIZMICH: Okie-doke. What is that?

INMATE KINCAIDE: It's a group. It's a program group.

PRESIDING COMMISSIONER PRIZMICH: Oh, okay. Okie-doke. And that looks like it has to do with parole plans. And then Kathy Horst (phonetic). So, do you have

that Mr. Stringer?

ATTORNEY STRINGER: Yes. Yes.

PRESIDING COMMISSIONER PRIZMICH: Okay. And Ms. Delagarza?

DEPUTY DISTRICT ATTORNEY DELAGARZA: Yes.

PRESIDING COMMISSIONER PRIZMICH: All right. Is there any confidential material in the file, Mr. Harmon? If there is, will we be utilizing any of that today?

DEPUTY COMMISSIONER HARMON: There is confidential information in the Central File. None of it will be utilized today.

PRESIDING COMMISSIONER PRIZMICH: Okay. We have an appellate decision but it's dated -- well it's filed February 23, 1990. It's rambling and long and it does not provide us with -- unless I missed something -- a real concise overview of the crime itself. So unless I have some objections, I will read into the record from the Deputy Probation Officer's report starting on page 2. It too is long but it's a little shorter and for our purposes, will be a little bit quicker. Ms. Delagarza, any objection to that?

DEPUTY DISTRICT ATTORNEY DELAGARZA: No objection.

PRESIDING COMMISSIONER PRIZMICH: Mr. Stringer?

ATTORNEY STRINGER: No objection.

PRESIDING COMMISSIONER PRIZMICH: All right. So

I'll start on line 13, page 2 and I think it concludes on page 4.

"Count One. On December 17, 1983, the defendant and co-defendant lie in wait to rob William Mendoza, M-E-N-D-O-Z-A, and while the codefendant robbed Mendoza, he shot him to death with a handgun while the defendant held the other victims at bay with a knife. On Count Two, December 17, 1983, the defendant and co-defendant stole money from William Mendoza at gunpoint and while doing so inflicted great bodily injury resulting in the victim's death. Count Three, on December 17th, 1983, the defendant and co-defendant stole money at gunpoint while the defendant was armed with a knife on Marilyn High, H-I-G-H, and while doing so, inflicted great bodily injury upon William Mendoza resulting in his death. At 7:30 p.m. on December 17th, 1983, victims Mendoza and High were closing Mendoza's business, Wire Technology on South Laurel in Los Angeles. They were loading some office equipment into the trunk of Mendoza's car and the victim High was standing in front of

the building between her parked car and the office door. She turned around and observed the defendant crouching between the Northeast wall of the building and a fence of the location. He ran up behind her and placed a knife to her neck. The victim, fearing for her safety, covered her head with her jacket and was then forced to the ground by the defendant. The defendant then began searching her person for money and valuables and subsequently took her purse which had landed on the ground between her legs. The victim High remained on the ground covered by her jacket. Meanwhile, co-defendant had apparently confronted victim Mendoza. Victim Mendoza was unwilling to give up his money and the defendant shot him with the bullet entering his left eye and apparently causing almost instantaneous death. After the gunshot, the defendant yelled at the co-defendant to "get his wallet. Get his wallet." Victim High remained on the ground while the co-defendant apparently went through the victim Mendoza's pockets removing his wallet which

contained approximately $600 in cash and miscellaneous credit cards and identification. The co-defendant then apparently confronted the victim High asking her if any money was in the store or if there was a safe while asking her, placing a gun against her right cheek. She then indicated there was no money inside. The co-defendant then told the victim High that he was going to kill her and started counting to five. The defendant and co-defendant then fled the area. The victim High went to victim Mendoza's aid but paramedics upon arrival pronounced (it says produced. It should be pronounced) Victim Mendoza dead from a single gunshot wound to the left eye at approximately 7:40 p.m. Sheriff's homicide detectives developed information on the streets that in individual nicknamed 'Kool-Aid' had done the shooting and that he had a girlfriend with him by the name of 'Candy'. Kool-Aid was determined to be one of the codefendant's nicknames and he subsequently turned himself in to investigating officers on February 6,

1984. The co-defendant denied any involvement in the offense. The defendant was arrested in January 1984 and after initially denying his involvement in the offense, admitted to investigators that he and the co-defendant had gone to the location for the purposes of committing a robbery and that it was the co-defendant who shot and killed the victim. He further stated that the co-defendant had forced the victim to the ground at knifepoint and appeared to be making cutting motions at the victim when he pulled out a gun and shot the victim point blank as he was lying on the ground."

I'll go into your criminal history. Juvenile history is as follows. 10/14/76, LASO Burglary. A petition was requested and I don't have any disposition on that. 12/27/76, looks like a couple months later, LASO Petty Theft. Petition was requested and you were placed on home probation. It was a bicycle theft apparently. 1/5/77, about a month later, LASO 664211 which is Attempted Robbery and 12020.5 which is Use of a Firearm in the Commission of a Crime. Petition was requested and you were ordered on voluntary supervision. 5/18/77, several

A22

months later, LASO 12020 PC Possession of nun chucks. Counseled then released. 12/5/78, LASO, Possession of a Weapon at School. You were declared a ward of the court and ordered to do some kind of placement. Had an 8 inch knife apparently, 8 inch blade knife. 9/26/79, LAPD Burglary and Possession of or Receiving Stolen Property. Petition was sustained and you were -- remained in placement. Jurisdiction was terminated on 11/5/80 and -- but on 9/13/80, LASO, a 12020A. There was a petition. That was another weapons thing with nun chucks, another nun chucks thing. The matter was held in (inaudible) by the probation department. 1/15/81, LAPD, 647A Annoying Children. Petition was requested. Was reduced to a Battery and that petition was sustained. Says here that the defendant attempted to rape a girl walking down the street, holding her and biting her on the neck until she was able to break through and go to her school where she was able to get help. That was what was the described incident that was reduced to a Batter. Adult history is as follows: 7/23/83, LASO 211 a Robbery. Sentenced to 10 days in the county jail. You were charged with robbery. It was ultimately convicted of petty theft. 1/25/84, LASO 187 which is murder and that pertains to this case here. LASO in the custody division. 6/12/84, 288A3 Oral Cop While Confined in Prison or Jail. And let's see what

D23

happened. Guilty to the 288A. Sentenced to 20 days in county jail. Okay. I am not going to ask you any questions. I think that's your attorney's request so let me go to your personal and social history. Is this okay for questioning, Mr. Stringer?

**ATTORNEY STRINGER:** Yes.

**PRESIDING COMMISSIONER PRIZMICH:** All right. Let's see, you were born in Los Angeles on March 7th, 1965 and you were born to your parents of Billie Kincaide and Henrietta Lyons.

**INMATE KINCAIDE:** Yeah.

**PRESIDING COMMISSIONER PRIZMICH:** Did they -- did they stay together or did they split up?

**INMATE KINCAIDE:** No. They weren't together. They weren't even married.

**PRESIDING COMMISSIONER PRIZMICH:** Oh, did they ever -- did they get split up after that?

**INMATE KINCAIDE:** They never got married.

**PRESIDING COMMISSIONER PRIZMICH:** Oh, okay. So he was -- Billie -- did you know Billie, Mr. Kincaide.

**INMATE KINCAIDE:** Yeah. I knew my father. Yeah.

**PRESIDING COMMISSIONER PRIZMICH:** Did he visit or anything?

**INMATE KINCAIDE:** Yeah. He always come over there [sic].

D24

PRESIDING COMMISSIONER PRIZMICH: Now how old -- is Mr. Kincaide still alive?

INMATE KINCAIDE: No. They both passed.

PRESIDING COMMISSIONER PRIZMICH: They both did. I'm sorry to hear that. When did Mr. Kincaide pass?

INMATE KINCAIDE: He passed when I was out there. He died of (inaudible) of the liver.

PRESIDING COMMISSIONER PRIZMICH: Oh, okay. So he was a drinker?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: What about your mom, Ms. Lyons?

INMATE KINCAIDE: My mom died when I was in here. She died in her sleep.

PRESIDING COMMISSIONER PRIZMICH: Oh, that's too bad. Do you have any brothers or sisters? You've got a bunch, I think.

INMATE KINCAIDE: I got a couple brothers. One of them is a security guard right now.

PRESIDING COMMISSIONER PRIZMICH: Okay. It says here you've got 10. Are they half brothers and two sisters?

INMATE KINCAIDE: Half brothers.

PRESIDING COMMISSIONER PRIZMICH: Okay.

INMATE KINCAIDE: I've got two real brothers and

all the rest of the them are half brothers.

PRESIDING COMMISSIONER PRIZMICH: All right. Do any of your brothers, whole or half, visit you here?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER PRIZMICH: When did you last get a visit from them?

INMATE KINCAIDE: I haven't had one in a long time.

PRESIDING COMMISSIONER PRIZMICH: Long time. Okay. You have any children, sir?

INMATE KINCAIDE: No, sir.

PRESIDING COMMISSIONER PRIZMICH: Have you ever been married?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER PRIZMICH: You used to be a member of the Grape Street Crips?

INMATE KINCAIDE: Yeah. Yeah.

PRESIDING COMMISSIONER PRIZMICH: You still a member?

INMATE KINCAIDE: Nope.

PRESIDING COMMISSIONER PRIZMICH: What did those guys --

INMATE KINCAIDE: I gave that --

PRESIDING COMMISSIONER PRIZMICH: -- huh?

INMATE KINCAIDE: -- I gave that up a long time

ago.

PRESIDING COMMISSIONER PRIZMICH: Okay, what did the Grape Street Crips do for you? What was the point in that?

INMATE KINCAIDE: It really wasn't nothing. There wasn't no point [sic].

PRESIDING COMMISSIONER PRIZMICH: You just hanging out and --

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: -- did you sell drugs for them or anything?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER PRIZMICH: You shoot anybody for them?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER PRIZMICH: Did you carry guns?

INMATE KINCAIDE: No, I never carried no -- I carried my own but not none of theirs [sic].

PRESIDING COMMISSIONER PRIZMICH: Okay. A lot of those guys have community guns that they all share.

INMATE KINCAIDE: Yeah. I don't get up into that no more [sic].

PRESIDING COMMISSIONER PRIZMICH: I hope not.

INMATE KINCAIDE: My mind is on a different page.

PRESIDING COMMISSIONER PRIZMICH: All right. What kind of drugs did you use when you were in high school or alcohol? Did you use alcohol in high school?

INMATE KINCAIDE: I used to drink.

PRESIDING COMMISSIONER PRIZMICH: In high school?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: When did you first start drinking?

INMATE KINCAIDE: By about 15.

PRESIDING COMMISSIONER PRIZMICH: All right. Did you get drunk?

INMATE KINCAIDE: Yeah, I got drunk but I never hurted nobody while I was drunk or nothing like that [sic].

PRESIDING COMMISSIONER PRIZMICH: Okay. And did you use drugs too?

INMATE KINCAIDE: Weed.

PRESIDING COMMISSIONER PRIZMICH: You used weed?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: During high school years?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Would you use that pretty regularly you think?

INMATE KINCAIDE: Sometimes. Not all the time.

028

PRESIDING COMMISSIONER PRIZMICH: Any other drugs?

INMATE KINCAIDE: No. No PCP --

PRESIDING COMMISSIONER PRIZMICH: I thought you --

INMATE KINCAIDE: -- or nothing like that [sic].

PRESIDING COMMISSIONER PRIZMICH: -- you use any pills? I thought I saw in here that you used pills for something. Reds? You use reds?

INMATE KINCAIDE: No. I never mess with that. I don't know how that got there. I don't (inaudible) messing with reds.

PRESIDING COMMISSIONER PRIZMICH: Let me see. I think I read it in the probation officer's report. Let me see. This is way back. Way back when you first came. I think the probation officer, whoever that was, asked you about it and I though -- and if I'm wrong, I'll -- said the defendant relates that he first tried reds and whites at age 7. You remember that?

INMATE KINCAIDE: Oh, okay yeah. I remember that. Yeah, I tried but they didn't -- not -- I didn't mess with it.

PRESIDING COMMISSIONER PRIZMICH: Okay.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: About age 10 you started using marijuana. Is that about right?

INMATE KINCAIDE: Yeah.

D29

PRESIDING COMMISSIONER PRIZMICH: Okay. Indicates that you only drinks [sic] beer. One or two six packs of beer a week about is what you report then, okay? Does that sound about right?

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: Remember some of that? All right.

INMATE KINCAIDE: Yes, sir.

PRESIDING COMMISSIONER PRIZMICH: You don't remember the cocaine, huh?

INMATE KINCAIDE: No.

PRESIDING COMMISSIONER PRIZMICH: Did you slam it or snort it?

INMATE KINCAIDE: Didn't do none of it.

PRESIDING COMMISSIONER PRIZMICH: None of it. Okay. All right.

INMATE KINCAIDE: Sherm, yeah. I did a little bit of sherm, yeah.

PRESIDING COMMISSIONER PRIZMICH: You smoked that.

INMATE KINCAIDE: Yeah. I did a little bit of that.

PRESIDING COMMISSIONER PRIZMICH: You do the moon walk?

INMATE KINCAIDE: Nope.

PRESIDING COMMISSIONER PRIZMICH: You know what



I'm talking about.

INMATE KINCAIDE: Yeah. I know what you're talking about.

PRESIDING COMMISSIONER PRIZMICH: Scary guys, those guys.

INMATE KINCAIDE: Yep. But don't mess with it no more [sic].

PRESIDING COMMISSIONER PRIZMICH: All right. Let me turn your attention to Mr. Harmon who's going to go over since you came to prison. He's going to go over all that stuff.

DEPUTY COMMISSIONER HARMON: Yes, Mr. Kincaide. Good afternoon or is it still morning? Actually good morning. Still got a little bit of it left. We're going to make sure the record's correct first of all. I want you to listen carefully and if there's errors in the information, we'll correct it. You've only had an initial hearing back on April 22nd of '04 and at that time, you received a 4 year denial. You were received at CMF on September 27th of '01 from Old Folsom Prison and custody level today is Medium ARS and you're classification score revised is 19.

INMATE KINCAIDE: Yes.

DEPUTY COMMISSIONER HARMON: Okay. Let's look at your activities since your last hearing and to do that,

D32



I'll use your counselor's report as reference. Listen carefully because there may be errors in the information or it may be incomplete. I'll give you an opportunity to add to what I've said when I'm done. The counselor says that from August 2nd of '03 to August 1st of '04, it says you remained at CMF during the entire review period. Custody level remained the same. It says that you were assigned on June 8th of '04 to the vocational janitorial program. It talks about various certifications that you received during this period of time. And then it says prior to getting into the vocational janitorial program, you were in adult basic education and you received various certificates from your work in that area. It says that there was -- you were participating in Impulse Control group during the review period and you were also part of the mental health services delivery system at the Clinical Case Management or Triple CMS level of care. It shows that you received a 115 for mutual combat back on December 29th of '04. It says that you were also part of the developmental disability program, DDP. From August 2nd of '04 to August 1st of '05, you continued at CMF during the entire review period. You continued with your vocational program. You participated in an anger management group. You continued at the Triple CMS level of care. You remained disciplinary free. You continued in the DDP

program. From August 2nd of '05 to August 1st of '06, everything is remaining the same. There are no changes. It shows that you were participating in the Independent Living, Anger Management, Coping Skills, Lifer Anger Management 2 and Critical Thinking group. You continued your participation in the mental health program and you continued with DDP. From August 2nd of '06 to August 2nd of '07, everything remains the same once again. It does show that during this period, you participated in the Lifers group 1 and 2 and Coping Skills group. You continued in the mental health program and you continued with the DDP program. From August 2nd of '07 to approximately the first of December '07, everything remains the same. There are no changes and then from around December 1st of '07 to the end of October of '08, it says that you continue with everything that we've previously discussed but it does point out that your instructor left your vocational program at the end of July in '08 and the position has remained vacant. The record also reflects that received a chrono in July of '08 that you were a member of the long term commitment group. Says you consistently attend. It says that you've been attending AA on a regular basis; however there are no sponsors to run the program at this time. You're participating in Coping and Anger Management class and

D34

you're on a waiting list for a couple other programs. Shows that you continue at the Triple CMS level of care. No negative behavior. And that brings us up to just around November 1st and I don't have anything from November 1st to where we are today in mid April of '09; however, I reviewed your Central File and I hope it's correct. Over the last six months, can you kind of give us an idea of what activities you've been participating in and what your current assignment is?

**INMATE KINCAIDE:** I'm in the Voc Janitorial. I'm getting ready to graduate out of Voc Janitorial because they just got a new system -- person up in there -- inside there and I'm getting ready to graduate up out of there and stuff like that. I'm participating in a lot other groups and stuff like Anger Management and Coping Skills and stuff like that and I'm trying to better myself and stuff like that. Staying away from a lot of trouble and stuff like that to do something that is going to better me when I get out there on the streets and stuff like that. But I'm in a lot of groups. I've been going to a lot of groups and this group, LTCG group; I'm constantly going to that group and stuff like that.

**DEPUTY COMMISSIONER HARMON:** It's a life term group?

**INMATE KINCAIDE:** Yeah. Yeah. It's to help you

D 35

get back out there on the streets. And they teach you about, you know, sitting home -- sitting right there and then they ask you different questions. What would you do if you get involved in anything or somebody tell you to do something, how would you react? What would you do? I would walk away.

DEPUTY COMMISSIONER HARMON: When do you expect to graduate from the janitorial program?

INMATE KINCAIDE: Next month. Suppose to be next month.

DEPUTY COMMISSIONER HARMON: Okay. The record should reflect that you've obtained a number of certificates that are a part of your file indicating proficiency in various areas. I'm not going to go over each and every one because I know nothing about vocational janitorial other than the certificate of completion.

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: Okay. And you are in other programs today. What program specifically are you in today?

INMATE KINCAIDE: I'm in AA one right now. I got a lot of certificate on AA and I'm still in Coping Skills and stuff like that. Anger Management, I'm still into that group and stuff like that. Right now, my counselor's trying to get me into more other groups and stuff like

that but they haven't been available yet.

DEPUTY COMMISSIONER HARMON: Okay.

INMATE KINCAIDE: I wanted to get into.

DEPUTY COMMISSIONER HARMON: I noted that you consider yourself to be a portrait artist --

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: -- and you supplied some pictures for us to look at during our deliberations. ~~You know, the artistry is a wonderful thing but I'm not~~ sure it's enough to support you on the outside, so what --

INMATE KINCAIDE: I'm fitting to get up into janitorial.

DEPUTY COMMISSIONER HARMON: -- I see. Okay. And so you're going to do the janitorial.

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: What about your average week? What do you do in your free time?

INMATE KINCAIDE: My free time? Here? In my free time? I draw, keep busy. I go to the yard sometimes but I'm constantly staying into groups. I go to the law library and stuff like that.

DEPUTY COMMISSIONER HARMON: Why do you go law library?

INMATE KINCAIDE: Oh, do a little research. Somebody help me out. There's a person that be helping

D37

with my research and stuff like that. You know.

DEPUTY COMMISSIONER HARMON: I see. And do you participate in any church activities?

INMATE KINCAIDE: Yeah. I go to church every Sunday.

DEPUTY COMMISSIONER HARMON: I see. Do you go out on the yard?

INMATE KINCAIDE: Sometimes. Not all the time. I go there every blue moon. There really ain't nothing out there but walk around.

DEPUTY COMMISSIONER HARMON: Uh-huh.

INMATE KINCAIDE: And stuff like that.

DEPUTY COMMISSIONER HARMON: You want to tell us anything else about yourself and what you're doing?

INMATE KINCAIDE: I'm basically just trying to get my life -- like I said, I'm trying to get my life together. I'm trying to make sure that when I -- if I do get a date, that I get out there and be supportive and try to, you know, get me like a job like in janitorial. Like I said, my art is -- that's my life. I like, you know, doing portraits and stuff like that but I'm into janitorial because that's what I'm going to do when I get out. When I get out on the streets.

DEPUTY COMMISSIONER HARMON: Yeah. Let's see. That'll be your first vocational program you've

D 38

accomplished. You've done some other work. You've worked I guess in the clothing room, some grounds maintenance, Adult Basic Education, Culinary. And you've done some porter work. Your work seems to be adequate when you're working. I was going to say, you're actually under a tailored education plan, aren't you?

**INMATE KINCAIDE:** Yeah.

**DEPUTY COMMISSIONER HARMON:** Because of your limitations in education but I was looking in there and I did not see a chrono that would say that you have plateaued in education. Is there a chrono in there that reflects that?

**INMATE KINCAIDE:** Not that I know of. Not that I know of.

**DEPUTY COMMISSIONER HARMON:** So, my question is is it your intention to get re-involved in education?

**INMATE KINCAIDE:** Yeah. Yeah. That's what I'm going to do -- that's what I'm going to do when I get out there on the streets because it's -- that's what I want to do.

**DEPUTY COMMISSIONER HARMON:** How about in prison? Are you going to get your GED in prison?

**INMATE KINCAIDE:** I was working on that and it's really kind of hard for me to do that and I talked to the teachers about that and they said, "You've got to get your

D39

reading up." And I've been working on that and it's kind of hard for me to do that.

DEPUTY COMMISSIONER HARMON: You see, let me explain something to you that a lot of times when a person has a lot of difficulty, they reach a certain point where they can't go any further due to whatever limitations that person may have, okay. And I'm sure there's a wide variety and that's going to be important for you. If you don't think you can get yourself a GED, you need to talk to the instructor of the education department to see if they want to issue a chrono indicating that you've plateaued because it tells us that we shouldn't push you to do any more.

INMATE KINCAIDE: Yeah, I already -- matter of fact, I did talk to a couple of the teachers there. They said, "We going to end up putting a chrono." And I don't know if they did or not but that's what they were suppose to do and stuff like that.

DEPUTY COMMISSIONER HARMON: I didn't see it.

INMATE KINCAIDE: Yeah. They were supposed to do it but I don't know why they didn't.

DEPUTY COMMISSIONER HARMON: I could have missed it. You never got a chrono that said that that you're aware of, huh?

INMATE KINCAIDE: No. I never -- they never

issued me no chrono.

DEPUTY COMMISSIONER HARMON: Okay. Your self-help group, we've covered them. Those are the ones that you've been accomplishing over the last couple years starting with the, you know, pretty much Critical Thinking in '06. Well, you've been down there how long now?

INMATE KINCAIDE: 22 years.

DEPUTY COMMISSIONER HARMON: Right. And you started your self-help in about '06. Why did you wait so long?

INMATE KINCAIDE: I was going through some things and stuff like that. Trying to get myself, you know, in the right order and stuff like that. Trying to, you know, get away from that madness and listening to other people that ain't -- you know, that try to disturb me in the wrong way and stuff like that. And now, since I got a little older and wiser and understanding, now I can, you know, better myself and go forward and stuff like that. And that's what I have been doing.

DEPUTY COMMISSIONER HARMON: You do -- what I -- you've taken some Anger Management and, you know, you had that cell fight in 2004 in December and, you know, that indicates violence. I know you plead guilty to the violation. It was with your cellie. What do you think you could've done differently today to avoid that

situation?

INMATE KINCAIDE: I could have said something to the officer about it. But it went too far and it got -- and he socked me so I just went off. If I would have known then what I know now, it wouldn't have happened like that.

DEPUTY COMMISSIONER HARMON: What do you know now?

INMATE KINCAIDE: I know not to get involved in fights. I know not to cause harm to other people and stuff like that.

DEPUTY COMMISSIONER HARMON: If I say to you that there's recognized triggers of anger -- that's referred to a lot -- triggers of anger, what does that mean to you?

INMATE KINCAIDE: I ain't for sure.

DEPUTY COMMISSIONER HARMON: What is the most important thing that you learned in your Anger Management?

INMATE KINCAIDE: Learn how to control it.

DEPUTY COMMISSIONER HARMON: How do you do that?

INMATE KINCAIDE: Me, myself, if I get into an argument, I'll just think about it. I just -- if I'm getting ready to do some -- getting in a fight or anything, I think about it. I say it's the wrong thing to do. I'll end up going to hole or they going to put me in my cell so I just go to my cell and don't think about it. Then, if I see the person, I just tell them I'm sorry, you

D42

know. Like that, you know. I won't get involved in it. Like that. If he accept it, if he don't, oh well. I just walk away from it.

DEPUTY COMMISSIONER HARMON: Do you believe you could use further education in the area of Anger Management?

INMATE KINCAIDE: Yeah. Yeah.

DEPUTY COMMISSIONER HARMON: What areas would you like to cover?

INMATE KINCAIDE: A little bit more about understanding the anger and stuff like that.

DEPUTY COMMISSIONER HARMON: Uh-huh. Did you ever learn the steps in your 12-step program?

INMATE KINCAIDE: Not many of them because I can't read that well.

DEPUTY COMMISSIONER HARMON: Uh-huh.

INMATE KINCAIDE: And stuff like that.

DEPUTY COMMISSIONER HARMON: But they talk about them, don't they?

INMATE KINCAIDE: Yeah, they talk about them.

DEPUTY COMMISSIONER HARMON: The first step deals with taking moral inventory. Remember that?

INMATE KINCAIDE: Yeah. Moral inventory yourself.

DEPUTY COMMISSIONER HARMON: Yeah. Have you done that?

INMATE KINCAIDE: Yeah. I've took a lot more inventory of myself and focusing on myself. What should I do and stuff like that, you know.

DEPUTY COMMISSIONER HARMON: Do you remember the one about making amends?

INMATE KINCAIDE: Yeah. Yeah.

DEPUTY COMMISSIONER HARMON: What does that mean to you?

INMATE KINCAIDE: Making amends to myself or to other people.

DEPUTY COMMISSIONER HARMON: Uh-huh. What does that mean to you?

INMATE KINCAIDE: It meant making amends to my -- amends to knowing what right and knowing what's wrong and stuff like that.

DEPUTY COMMISSIONER HARMON: What do you know about the victim?

INMATE KINCAIDE: Mendoza? Mr. Mendoza? Not much.

DEPUTY COMMISSIONER HARMON: Why not?

INMATE KINCAIDE: Because I never went up the man and even talk to the man and stuff like that.

DEPUTY COMMISSIONER HARMON: Who did you go up to?

INMATE KINCAIDE: Really nobody.

DEPUTY COMMISSIONER HARMON: Wasn't it the --

okay.

PRESIDING COMMISSIONER PRIZMICH: He doesn't want to talk about that.

DEPUTY COMMISSIONER HARMON: Okay. Do you feel that you can make amends to the --

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: -- how many victims were in this crime?

INMATE KINCAIDE: Two.

DEPUTY COMMISSIONER HARMON: How do you think you can work through this step?

INMATE KINCAIDE: About, you know, explaining to what would've happened and stuff like that and going and trying to talk to them and stuff like that. Tell them how sorry that I am about what happened and stuff like that. You know. I know it was wrong for me doing that.

DEPUTY COMMISSIONER HARMON: Yeah. I've read your transcript from the last hearing and I know you don't want to talk about the crime, but these are pretty important steps that you follow that, you know -- they're the 12 steps and I guess I'm just curious why you don't know more about your victims.

INMATE KINCAIDE: Because I never -- they never got in contact with me and I never got in contact with them.

D45

**DEPUTY COMMISSIONER HARMON:** Okay. Okay. There has been a total of seven 115s and I've mentioned the last one that you had and 13-128s, the last one in February 15th of '02, a failure to report to your job. These 115s of course go back to 1988 and that's when they found the metal piece in your pillow.

**INMATE KINCAIDE:** Uh-huh.

**DEPUTY COMMISSIONER HARMON:** And then you had a fighting again in '93 and actually the other 115s do not involve violence or weapons. Anything you want to talk about regarding your 115s? Are you guilty of the 115s?

**INMATE KINCAIDE:** Yes, I am.

**DEPUTY COMMISSIONER HARMON:** Are you guilty of the 128s?

**INMATE KINCAIDE:** Yes, I am.

**DEPUTY COMMISSIONER HARMON:** Okay. I think I've covered your accomplishments. Is there anything you'd like to add to any of the accomplishments?

**INMATE KINCAIDE:** I wish I can just learn more and stuff like that and, you know, get more involved in, you know, helping others and stuff like that and myself and stuff. Because if I do get out, I'm going to like see my parole agent, then I'm going to let him know that I'm fitting to start helping young kids and stuff like that, juvenile halls and stuff like that. You know, be a

D46

motivator, speaker and stuff like that.

DEPUTY COMMISSIONER HARMON: Well whatever got you going in '06, you did the right thing because now that you've got some certificates of work in those areas and in just talking to you, I can see that you were doing some listening and that's important.

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: So you're on the right track, okay?

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: But you've got work to do. You know, I'm not going to say you don't, okay? You have work to do but you're on the right track. I'm going to go onto your doctor's report, okay? Now before I do that, I want to ask you two very important questions. The first one is do you believe that you still pose a risk for the safety of the people outside of the prison walls today?

INMATE KINCAIDE: No, I don't.

DEPUTY COMMISSIONER HARMON: What do you believe makes you a different man today than the man that came into prison for the life crime?

INMATE KINCAIDE: Because I was young and I didn't know no better [sic] and I was following behind people that was into violence and stuff like that. Now since I

got older and now I'm more, you know, more loving to people and stuff like that then countering people and stuff like that and being more, you know, open and stuff like that. You know. If I see somebody doing something to somebody like a weak person, you know, I let that person -- he's weak, you know, don't mess with him and stuff like that. You know, that's how I feel now. You know, I got more involved in that and stuff.

DEPUTY COMMISSIONER HARMON: You sound like you're a much more happy person with yourself.

INMATE KINCAIDE: Yeah. Yeah.

DEPUTY COMMISSIONER HARMON: Did you get a copy of the doctor's report?

INMATE KINCAIDE: The psych?

DEPUTY COMMISSIONER HARMON: Yeah.

INMATE KINCAIDE: Yeah.

DEPUTY COMMISSIONER HARMON: Okay. I'm going to go to that. Dr. Sargent did it back in March of '08, S-A-R-G-E-N-T for the transcriber. And what I'm going to do, Mr. Kincaide, is I'm only going to take parts of that report because a lot of it is repetitive information that you and the Commissioner have gone over or it's in your transcript from last time. I'm not going to go into all that. But, then again, if I've left out something that's important, I'm going to give you that opportunity to add



to what I've said, okay?

**INMATE KINCAIDE:** Uh-huh.

**DEPUTY COMMISSIONER HARMON:** Under background information under the subheading of developmental history, the doctors writes:

> The inmate is developmentally disabled and he has always been a vague and sometimes inconsistent historian.

Under substance abuse history, the doctor writes:

> The inmate tells this writer he had 'a drinking problem' prior to prison. The record cites cocaine, PCP and marijuana use as a youth (beginning at age 10).

Under the subheading of mental health and medical history:

> The inmate has received prison mental health services the past several years (since 2001) at the case management level of care. He apparently experience paranoid ideation and auditory hallucinations for a relatively short period of time several years ago but this resolved and he has been free of symptoms for years. It does not appear that he is currently on psychotropic medications.

Under the heading of clinical assessment, subheading of

current mental status treatment needs, the doctor writes in part:

> The inmate is alert and oriented.  His thinking is slow and concrete and he has a poor grasp on concepts.  It is obvious that he is intellectually compromised.  His fund of knowledge and vocabulary are poor.  Over all, the inmate presents with no acute psychiatric symptoms.  His dysfunction appears primarily intellectual and personality based (anti-social).

Under diagnostic impressions, that particular subheading under Axis I the doctor writes alcohol abuse.  Axis II, anti-social personality disorder, mental retardation, severity unspecified (likely mild mental retardation).  Axis V, Global Assessment of Functioning, a GAF, current 65, highest test year 65.  Under the review of the life crime heading, subheading, the doctor writes:

> In part, this writer asked the inmate to describe the life crime and he stated "I am not guilty.  I am falsely accused."

Under the heading of risk for violence, the subheading of substance abuse dependence, the doctor writes:

> The inmate has a history of alcohol and possible drug abuse.

Under the subheading of mental disorder personality disorder, doctor writes:

> This is not entirely clear. He experienced some psychotic symptoms several years ago but he is not evidenced overt psychotic symptoms in some time.

Under the subheading of insight, the author writes:

> The inmate's level of insight appears quite poor. He denies past psychiatric symptoms. Denies participation in the crime and has a difficult time discussing his attributes and the relationship between emotional and behavioral issues. It is likely that his compromised intellectual functioning makes insight a difficult and unlikely prospect for him.

Under the subheading of impulsivity and behavioral control, the doctor writes:

> The inmate has generally maintained good control over his impulses while in prison the past two decades. He does have a mutual combat incident in 2004 but this appears in aberration during his prison tenure. He did have rather significant problems with impulsive behavioral control in the

community.

Under the subheading of viability of parole plans, the doctor writes:

> The inmate's parole plans appear viable. This may be a good plan if the place has an available bed. If it does not, it is unclear what he will do.

Under the subheading of exposure distress, the doctor writes:

> The inmate has demonstrated a mixed ability to deal with stress in prison. His coping skills are better than in the community when the lack of structure appeared to lead to problems managing his impulses.

Under the heading of conclusion, the doctors writes in part:

> Overall, Mr. Kincaide compared to other inmates appears to fall into a category that represents a moderate risk for future violence in the community. Although he has a history of substance abuse, he has been active in recovery services in the CDC and he professes a commitment to sobriety. The inmate's history of substance abuse, personality pathology, juvenile behavioral,

learning problems, limited insight and past criminal behavior do increase his risk. To his credit, he has a decent parole plan and he has taken steps to improve his employability.

That's from Dr. Sargent in March of '08. So Mr. Kincaide, I've taken parts of that in your report, parts of your counselor's report and parts of your entire institutional adjustment. Now I may have left out areas that are important to you and your attorney. I'm going to go back to the chair as we discuss your parole plans and other questions. Before we do, is there anything you wish to add to the areas that I've covered?

**INMATE KINCAIDE:** No. No, sir.

**DEPUTY COMMISSIONER HARMON:** Okay. Counselor?

**ATTORNEY STRINGER:** I'd just like to note for the record, Commissioner, that the doctor only used one of the three diagnostic tests that are now commonly used. That was the HCR-20 test. The other two were not utilized.

**DEPUTY COMMISSIONER HARMON:** Thank you. Anything else?

**ATTORNEY STRINGER:** Ready to continue.

**DEPUTY COMMISSIONER HARMON:** Thank you. I'll return to the chair.

**PRESIDING COMMISSIONER PRIZMICH:** Thank you. I'm



going to go to your parole plans, Mr. Kincaide. And reading out of the counselor's report, you plan to live with your girlfriend, Ms. Norma Albert and she lives in Los Angeles?

INMATE KINCAIDE: Yes.

PRESIDING COMMISSIONER PRIZMICH: Okay. It has not been verified yet but I'll be looking in the letters here. And you also plan to seek -- what kind of employment is a professional artist or in the janitorial work? Apparently you've got a certificate dated June 28, 1995 from UCLA for portrait drawing. So was that a correspondence class?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Okay. Let me go to letters here. There's a letter here for August 24th, 2007 from the Division of Adult Paroles. Did you write to them or something?

INMATE KINCAIDE: Somebody helped me write to them.

PRESIDING COMMISSIONER PRIZMICH: To find out about what services they could provide?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Is that basically it? Okay, well I want to let you know that we do have that. December 20th, 2008, Delancy Street, Sarah

Peters, P-E-T-E-R-S. And that's a letter or request that you made to them for housing. They have several locations here in California, one in San Francisco and one in LA. So they said they will evaluate you when you get a date. How long is the minimum stay there? Do you know? Did they give you any brochures on that?

INMATE KINCAIDE: They didn't really say. They said whenever you get a date, just come.

PRESIDING COMMISSIONER PRIZMICH: All right. Catholic Rainbow Outreach, Robert Villanueva, Program Director. November 11th, 2008. And that's Whittier, California. They assist you with counseling and finding jobs is basically what it is, right?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: So you looked into that for yourself. Let me go to these letters here. We have a letter from Catargeo, March 17th, 2009, Lois Wright. I think that's a Master in Social Work is her little letters behind her name. She's the founder and executive director of this group. Where's the group at? Oh, Vacaville. Okay. So they come and offer services here I assume.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Okay. And she writes, and her personal impression is that you're a



person of sound character. It says you harbor an attitude of service which is a good thing. So she writes a supportive letter on your behalf, sir. You have a Kathy Horst, H-O-R-S-T. I don't have a date on this letter unless it's hiding. It's up in the corner. It is hiding from me. 3-13-09. She's an employment specialist for the state employment office. But you apparently had written her. She says come talk to them when you get out and they'll try to help you find a job. Okay. All right. And then we have Michael's Transportation Service in Vallejo from Keith Judkins, J-U-D-K-I-N-S. It's not signed but it is -- is it dated? Date the other side. And let's see. What is this? MTS is the abbreviation for that. So this was job that you were trying to find out about and they sent you back some information saying what they did. They are public and private school districts. They help out local transportation authorities, freight companies. So they do a lot of things, right?

**INMATE KINCAIDE:** Yeah.

**PRESIDING COMMISSIONER PRIZMICH:** All right. Okay. And I got this one. Did I get them all sir? Is that everything?

**ATTORNEY STRINGER:** Well, we do have some additional material that goes along with the Kathy Horst letter that (inaudible).

D56

PRESIDING COMMISSIONER PRIZMICH: Okay, if you can give it to the officer.

ATTORNEY STRINGER: Just relates to my client just to --

PRESIDING COMMISSIONER PRIZMICH: Yeah, that'd be easier.

ATTORNEY STRINGER: -- secure --

PRESIDING COMMISSIONER PRIZMICH: Thanks.

ATTORNEY STRINGER: -- employment.

PRESIDING COMMISSIONER PRIZMICH: Now Kathy Horst, the letter I already wrote [sic] is duplicated here but she's got attachments with it here. Right to fair employment. So, she gives you your rights here. Solano. And then she's provided you with a -- some other options. Employment connections. Solano employment connections. And I have several very nice pieces of yellow paper here that don't have anything on them.

INMATE KINCAIDE: Yeah.

ATTORNEY STRINGER: We knew you'd appreciate that.

PRESIDING COMMISSIONER PRIZMICH: Yeah, I do appreciate that. And then she goes through on that. So these people have put together a packet for you, huh?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Well that was very nice of them. And it gives you some directions on

what questions you need to ask yourself, you know, to help you find a job. That's the pink thing here. Career one stop shop. That's the state organization, isn't it?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Yeah, and it goes through and -- see if there's anything in here I'm qualified for. Very nice. They've done a lot of work for you, huh?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: And I've already mentioned this, the employment connection. So you've got all that stuff.

ATTORNEY STRINGER: Did you mention Waldon House, Commissioner.

PRESIDING COMMISSIONER PRIZMICH: I did not because I didn't see it. If you could give it to the officer.

ATTORNEY STRINGER: And --

PRESIDING COMMISSIONER PRIZMICH: They're dying to get up and walk around.

ATTORNEY STRINGER: -- we have also a letter from the Department of Public Social Services --

PRESIDING COMMISSIONER PRIZMICH: I didn't get that either.

ATTORNEY STRINGER: -- it's from the city of Los

Angeles.

**PRESIDING COMMISSIONER PRIZMICH:** Okay, good. So you're on a letter writing campaign, huh?

**INMATE KINCAIDE:** (inaudible).

**PRESIDING COMMISSIONER PRIZMICH:** That's what you've got to do, man.

**INMATE KINCAIDE:** They've been helping me.

**PRESIDING COMMISSIONER PRIZMICH:** There you go. Department of public social services. I'm looking to see if they took the cross out of the city seal. They were supposed to do that. David Tran, Deputy District Director, January 30th, 2009. Sorry. So I'm not sure what this does. This just gives you some directions on where to go. I see. Public Social Services. The Sheriff's Department does homeless shelters? The Sheriff's department.

**ATTORNEY STRINGER:** It's just submitted for the purpose of --

**PRESIDING COMMISSIONER PRIZMICH:** Right.

**ATTORNEY STRINGER:** -- showing my client is making an effort.

**PRESIDING COMMISSIONER PRIZMICH:** He's worked at it.' Right. Yeah. I understand. It's very clear that you have. Waldon House and that's in -- where is Waldon House? I didn't think it was -- where is that? Waldon

House is a transitional housing unit, isn't it?

**ATTORNEY STRINGER:** Well, that's a specialized program for people coming out of prison.

**PRESIDING COMMISSIONER PRIZMICH:** Right. Okay. Okay. But they -- you've written them and obviously you've made a lot of contacts for yourself. That's what you've got to do. Good deal. And I looked at these pictures. Now, here's what I did. I screwed this up. See, I admit my guilt. I took a rubber band off of this and I busted it so I don't know. I've got another rubber band here. I don't -- are you allowed to have something like this?

**INMATE KINCAIDE:** Yeah.

**PRESIDING COMMISSIONER PRIZMICH:** It's okay?

**INMATE KINCAIDE:** (inaudible).

**PRESIDING COMMISSIONER PRIZMICH:** All right. I didn't want to put that back on there and get you -- but there's a lot of letters in here. I'm a little bit hesitant about going into the letters because they look like they're kind of personal. People who are -- it looks like -- I'm guessing that they were thanking you and -- do you mind if we look at these?

**INMATE KINCAIDE:** Yeah. You can look at them.

**PRESIDING COMMISSIONER PRIZMICH:** All right. And these fine ladies and gentlemen -- are they associated

with this group here? The Cairo's?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Okay. I mean --
is that you?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: You weren't as
grey.

INMATE KINCAIDE: No. Nope.

PRESIDING COMMISSIONER PRIZMICH: All right, well,
what a fine looking group of people. And then I did look
at your drawings. Is this someone you know or is it -- do
you do this for other inmates?

INMATE KINCAIDE: Yeah. I do it for the inmates
sometimes. Not all the time.

PRESIDING COMMISSIONER PRIZMICH: They pay you for
it?

INMATE KINCAIDE: No. I just do just to be doing
them.

PRESIDING COMMISSIONER PRIZMICH: You're good.
Very nice. And then I saw these as well. You've done a
good job. This -- I've got to tell you, this one is
particularly good. Did you like that one?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: That's very
good. I mean that has a lot of character to it. Did I --

we'll look at these. We'll make sure you get them back but we'll look at them in deliberation.

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: You feel pretty good about yourself now?

INMATE KINCAIDE: Yeah.

PRESIDING COMMISSIONER PRIZMICH: Feel better than you did before?

INMATE KINCAIDE: Yep.

PRESIDING COMMISSIONER PRIZMICH: Okay.

INMATE KINCAIDE: Sure am.

PRESIDING COMMISSIONER PRIZMICH: Yeah. Okay. That's what you've got to do. I'm going to give the District Attorney an opportunity to ask questions.

DEPUTY DISTRICT ATTORNEY DELAGARZA: Commissioner.

PRESIDING COMMISSIONER PRIZMICH: Yeah. You want to ask any questions? Go ahead. I'm sorry. It's just like I can't quite get this through my head that I -- he's already talking and I've got to ask him again.

DEPUTY COMMISSIONER HARMON: Yeah, I do.

PRESIDING COMMISSIONER PRIZMICH: All right. Go ahead.

DEPUTY COMMISSIONER HARMON: Mr. Kincaide, I realize you don't want to talk about the life crime but I generally have a question that I've got to ask with people

D62

that don't want to talk about the life crime and your attorney can tell you not to answer this, but here's where I'm thoroughly and completely confused. At your initial hearing back in 2004, Commissioner Fisher, F-I-S-H-E-R, reads into the record the crime that occurred and then goes into a statement that you had made at some point where you were not at the scene of the crime and she says to you, I'm referring to page 14 where it starts, and she says, "And you, do you still contend that you were not there?" And then your response is, "I can say, I can say yeah, I was there." Fisher says, "You were there?" And you said, "Yeah." Fisher says, "In what part did you play in it? Did you run up behind Ms. High and put a knife at her neck?" And you said, "Yes, I did." And it goes on. It talks about you searching her purse and that and it goes on. And that's in 2004. And then I read Dr. Sargent's report in 2008 which is fairly recent. It's only last year, a year and a month ago, and the doctor asked you the same question and it's -- and refer to page 4 of that report, it says, "This writer asked the inmate to describe the life crime." And you stated, "I am not guilty. I am falsely accused." So, without talking about the life crime, I'm thoroughly confused.

**ATTORNEY STRINGER:** No, I'm going to instruct my client not to answer that Commissioner. He was, to my

belief, honest and forthright with the previous Panel who had every opportunity to question him as clearly in the record. It's his position that he did not say that to Dr. Sargent, that Dr. Sargent simply pulled that from some other report, probably a much earlier report, the probation officer's report. But, we'll stand on what he said to Commissioner Fisher.

**DEPUTY COMMISSIONER HARMON:** Thank you. I'll my questions revolve around the life crime. I'll return to the chair. Thank you.

**PRESIDING COMMISSIONER PRIZMICH:** Thank you. We will now go to the District Attorney who is here to represent the people so if you have questions, ma'am, you can ask me and I'll ask the inmate.

**DEPUTY DISTRICT ATTORNEY DELAGARZA:** My questions revolve around the life crime, so I have no questions.

**PRESIDING COMMISSIONER PRIZMICH:** Okay. Mr. Stringer, please?

**ATTORNEY STRINGER:** Thank you Commissioner. Mr. Kincaide, if the Board was to grant you a parole date today and one of the conditions of parole was that you attend AA or impose a number of other conditions upon you such as you attend Anger Management, whatever your agent wanted you to do, would you comply with it?

**INMATE KINCAIDE:** Yes, I will.

N64

**ATTORNEY STRINGER:** Okay. And you indicated that you had a number of skills now in the janitorial program. Is that correct?

**INMATE KINCAIDE:** Yes, I do.

**ATTORNEY STRINGER:** If you couldn't get a job in the janitorial program and your agent wanted you to apply for Social Security Supplemental Income benefits, commonly known as SSI, would you do it?

**INMATE KINCAIDE:** I would accept it.

**ATTORNEY STRINGER:** And whatever your role was in the life crime, you're sorry for that?

**INMATE KINCAIDE:** Yes, I am.

**ATTORNEY STRINGER:** If you had the opportunity to market any of your drawings over the internet, sell them on EBay, would you take that opportunity?

**INMATE KINCAIDE:** Yes, I would.

**ATTORNEY STRINGER:** And you've thought about that?

**INMATE KINCAIDE:** Yep.

**ATTORNEY STRINGER:** And you've done a lot of work to contact various different agencies, done a lot of work in the prisons in various groups, Cairo, Catargeo. Is this an effort by you to try to change your life outlook and behavior?

**INMATE KINCAIDE:** Yes, it is.

**ATTORNEY STRINGER:** Are you going to continue that

regardless of what happens?

**INMATE KINCAIDE:** I will continue that.

**ATTORNEY STRINGER:** Thank you. That's all I have, Commissioner.

**PRESIDING COMMISSIONER PRIZMICH:** Thank you. Any questions?

**DEPUTY COMMISSIONER HARMON:** No.

**PRESIDING COMMISSIONER PRIZMICH:** We'll go to closing, ma'am?

**DEPUTY DISTRICT ATTORNEY DELAGARZA:** Thank you. While the inmate is to be commended for the positive aspects of this programming, it is the position of the District Attorney's Office that the inmate is still not suitable for parole and would continue to pose a threat to society. For that reason, we are opposing the granting of a parole date for this inmate. As it relates to the life crime itself, the inmate has made many inconsistent statements and continues to make inconsistent statements regarding his involvement in the life crime. As the Commissioner indicated in the most recent psychological evaluation, he denied any participation in it and while he did not make any statements today, his attorney indicates that he does in fact admit his involvement; however, if you go back to the psychologic -- the counselor's report in 2008, in that counselor's report, the inmate denied

involvement in it and the prior counselor's report, the inmate denied any involvement in the life crime and in the probation report, after having testified at trial, admitting his involvement in the life crime, during the time of the probation report, he categorically denied any involvement in the life crime. So there seems to be a major disconnect with this inmate as it relates to the life crime and his involvement in it. The psychological evaluation talks about his lack of insight and I would submit to the Panel that at this point, based on his -- on the fact that he keeps making inconsistent statements about his involvement in the life crime, it is unclear what, if any insight he has into the life crime and what, if any remorse he actually has as it relates to the life crime. In regards to his violence potential, going through his entire history, there are questions about this inmate that makes the District Attorney's Office question whether or not he continues to pose a threat and I would refer the Panel to his prior histories involving the assault on a minor that was reduced to a battery, the oral copulation in prison. He has 115s in prison and although the psychologist refers to him as being an anomaly, he does have first of all in 1988, he was in possession of a shank and then in 1993, he has a fighting. And then in 2004, he has a mutual combat. So, it would appear to me

that the fighting is not an anomaly and it should create reason for concern with this Panel or any Panel as it relates to the inmate's violence potential. With respect to his parole plans with all due respect to counsel, it is our position that they are still somewhat tenuous. It is questionable whether or not this inmate could in fact make a living as an artist. There are a lot of people out there who have much more extensive background than the inmate, having gotten a certificate from UCLA, as great as that school is, and again, it does not seem that it is a viable plan and he does not have any vocations while in prison. He is a work in progress. He does seem to be working toward that but at this point; it does not appear that there is sufficient work by the inmate to ensure that if he is released, that he will in fact be able to support himself. For all those reasons, it is the position of the District Attorney's Office that he is still not a suitable candidate and we would oppose granting a parole date. Thank you.

**PRESIDING COMMISSIONER PRIZMICH:** Thank you. Mr. Stringer please?

**ATTORNEY STRINGER:** Thank you, Commissioner. The question the Board must answer under the law is does Mr. Kincaide, as he sits before you now, pose an unreasonable risk of danger to society and a threat to public safety?



To Mr. Kincaide's credit, he certainly is making a great effort to come before this Board with adequate parole plans. And this is from an individual that has been described as developmentally challenged. He has some difficulties with reading. He has some other cognitive difficulties and yet he does everything he can within his power to come before this Board with good parole plans. Many times, you don't even get that much effort from people that have all of their faculties, much less a person that is challenged in that area. So I think that speaks volumes about Mr. Kincaide's sincerity and his wish to change and his wish to become a productive member of society. His involvement in Catargeo and Cairos and the lifer groups and the other self-help groups that he's participated in show that he is very sincere about changing and rehabilitating himself within the prison system and taking advantage of those opportunities that present themselves. Now, I don't see anything in his background that shows that at an earlier age, he was an artist or took up any type of drawing as a vocation. So coming into the prison system and then discovering that talent and being as good as he is now and also enrolling at UCLA and completing that program shows that not only does he have real talent, but he has the ability to stick to programs once he is enrolled in them and fight through

logical sense that several years later, he would deny what he had already told the Panel, especially in a suitability hearing. I think with someone that does have some mental health difficulties and does have some developmental difficulties, sometime taking the time to ask the right questions and being patient with them usually yields many more good answers than just simply putting pressure on them to make some sort of response. But since Dr. Sargent isn't with the Board anymore, I guess I'm not able to ask him any of those questions. I note that the psychological report does not utilize two of the three tools that are normally utilized by doctors when making assessments, but despite that, the doctor still rates him as a moderate risk for future violence in the community. And that surely again is in the eyes of the beholder and his opinion, but it would not preclude him from achieving a date or finding of suitability from this Board. Previous evaluations have always indicated that my client is well motivated, stable, and working on impulse control and mood control and making progress with that. And once again, I think his presentation today and his behavior and actions lately within the institution show that he has turned that corner and is really trying. Therefore, under In re Lawrence, if the only criteria the Board was to use is the life crime to affect a denial, that is now impermissible



under the California State Court Decision. So I would ask that the Board seriously consider Mr. Kincaide for a date and if not that his denial be minimal in light of his excellent performance in the past few years in these institutions. Thank you.

**PRESIDING COMMISSIONER PRIZMICH:** Thank you. Mr. Kincaide, now you can make a closing statement. It should be directed at why you feel you're suitable for parole. So if you'd like, you may or you can rely on what your attorney's just said.

**INMATE KINCAIDE:** I feel that -- like I said, I feel that I'm changed. I'm not what I used to be when I was young. I feel that I can get back out there in society and be a productive person and not get involved in no crime, no gangs, or no none of that [sic]. I feel that, you know, I came a long way, you know. If I didn't come a long way, I wouldn't be in the predicament that I'm in now. But since I'm in the predicament that I'm in right now, now I'm changed. I'm not a 22-year-old, 14-year-old, 15-year-old. I'm in my 40s. I'm in my 40s. You know, so, I think I can and I will, you know, do whatever it takes to stay out there on the streets to be a productive person. And I'm willing to do that. You know, and like I said, I'm not trying to get caught up in no violence no more. I'm not -- that ain't for me. You

A71

know.  If I see trouble, if I wind up getting in trouble, I'll let my parole agent know.  I need to talk to you because I'm back into that range again and I need to let you know that, you know, I'm not trying to get in no trouble.  I need help.  Can you help me out?  Like that.  But like I said, I'm not trying to get in no trouble.  You know, I'm willing to get out there and to prove to society that I can be a productive person out there in society.  I wish I can get a chance on doing that and I pray to God that I do, you know, but I want to show that I can.

PRESIDING COMMISSIONER PRIZMICH:  Is that it, sir?

INMATE KINCAIDE:  Yeah.

PRESIDING COMMISSIONER PRIZMICH:  Thank you, sir.  We're going to now recess for deliberations.  The time is 12:35 and we'll call you back in when we've decided.  We're going to hang onto this for a just a bit and we'll make sure you get it back, sir.

**R E C E S S**

--oOo--

CALIFORNIA BOARD OF PAROLE HEARINGS

DECISION

**PRESIDING COMMISSIONER PRIZMICH:** Okay, we're on record. It is 1:00 o'clock in the matter of Eugene Kincaide, CDC number D as in David 64290. The Panel has reviewed all the information received from the public and all relevant information that was before us today in concluding that the prison is not suitable for parole and would pose an unreasonable risk of danger or a threat to public safety if released from prison. Our finding of unsuitability is based upon weighing considerations provided in California Code of Regulations Title 15. The first issue that we're going to speak to, Mr. Kincaide, is the commitment offense itself. In this case, there were multiple victims attacked. One individual died. That's Mr. Mendoza. But there were two victims there. The offense was carried out in a calculated manner and it was carried out dispassionately. The offense was carried out in a manner that demonstrates disregard for human suffering. I can't imagine what Mrs. High felt or thought when she saw that Mr. Mendoza had been shot through the eye and killed in this horrible crime. The motive of the crime was self-gain. We did look at and consider your criminal history, sir. It goes back a ways

**EUGENE KINCAIDE    D-64290    DECISION   PAGE 1    4/16/09**

and we did give some consideration. There were a number of arrests going back to the juvenile record and adult record as well. That gave us some concern due to the length and the volume of the arrests that you've had, so that was of concern. Now, all of those, the crime and the arrest record, those are static factors and those are something we look at but they diminish in their importance over time. What's the important thing is is how you've done since then and so it's kind of a scale that you, this is really important when you first come in. Depending on how well you work, it becomes less important. So, that was some time ago but it is something we took a look at. In terms of your understanding of the life crime, we did see that there were some changes in your commentary regarding the life crime, not only most recently and I'm not sure if that was a misprint on the part of the doctor -- I'm really not sure because you did admit to the crime in the past in the '04 Parole Consideration Hearing. But in the past prior to that, you were kind of going back and forth on things. So obviously there's been a period of adjustment in terms of your understanding and your recollection of the life crime. Our hope is that if that was an error on the part of the doctor that it is reflected in another

**EUGENE KINCAIDE      D-64290      DECISION    PAGE 2     4/16/09**

74

psychological evaluation and you can kind of get that story straightened out or squared away. But we did note that the story changed quite a bit over time. We need to have an understanding that you clearly have some insight into the crime and you take responsibility for the crime and that left us with some question that we did consider in our decision here. The psychological evaluation -- we do agree that the psychologist that did the evaluation, I think it was a Dr. Sargent, did not incorporate standard evaluation tools that we're used to seeing. That's not your fault certainly, but the one that he did look at was the historical factors and that was in the moderate range and that's understandable. It would have been nice to have some assessment as to how you're doing now and there really wasn't as much of an assessment as we'd like to see. We do find that that's too high for us. That left us with a rating that's too high. We are going to request another psychological evaluation to take a look at more comprehensively how you're doing here today. And it's clear that you've made some major changes and I hope it feels good because those are the kinds of things that we like to see. For whatever reasons, some inmates make the turnaround earlier, some later. What we want to see is the turnaround because that's what starts tipping the

**EUGENE KINCAIDE      D-64290      DECISION   PAGE 3     4/16/09**

D75

scale if you remember what I was saying just a moment ago. You know, the righteous, upright living that you need to do here and if you do that here, it will convince the Panel over here that you'll probably be the same kind of guy outside. There was an area of concern that we had and that was your 115. You got into a mutual combat in that 115 and that was since the last hearing. Now, we spoke to you about that today. You've done some work on that. You have a greater understanding on how to walk away or take deep breaths or whatever it is you need to do to get away from that, but that's a little bit too close to this hearing for us. So that was an area of concern that we had. In terms of your parole plans, you've done -- for you and even for, you know, the average inmate, you've done a darn good job putting stuff together for yourself. Part of the process is to demonstrate to this Panel that you're willing to invest yourself in the future and in doing that, you wrote a lot of letters obviously or someone helped you write the letters, which is fine. I don't care. You got the information back. You know, those are important things. That tells us you're really thinking about the future. So we encourage you to do that. If there is a transitional housing unit that you wish to go to, try as

**EUGENE KINCAIDE    D-64290    DECISION    PAGE 4    4/16/09**

best you can either with your cellie or your counselor or somebody to understand what the components are because what the Panel will ask is, you know, how long do you plan to stay there. What's the maximum length, what's the minimum length so that we have -- and it's not a little quiz. What it is is if you're invested in that future and you want to make it successful, you'll probably know more about it than just the average guy. So please find out as much as you can. And they usually give you brochures like you've got there. The Delancy Street usually gives you brochures or paperwork that describes their organization pretty fully and if you didn't get it, ask for that because those are the kinds of things that further demonstrate to us that you're really committed to this. You found out because some parts of it may not work for you, you know. Some parts of it may and you should be invested enough into what you're doing in the future to pick and choose or at least be aware of it. So, that's the only thing that -- your parole plans were pretty good. We compliment you and we know what kind of challenges you're facing on that, but you did a pretty darn good job on your parole plans. I already mentioned the 115s. There was one that was too recent to this hearing for us to ignore or -- we did

**EUGENE KINCAIDE       D-64290     DECISION   PAGE 5    4/16/09**

D77

weight that in this evaluation. In terms of the 3042 responses, the District Attorney was here today and does oppose your release. We don't feel that a 15 or a 10 year denial is appropriate in your case but based upon the areas of concern that I noted already, the 115s and you need to get that vocation. That's going to help you out. I mean, you're pretty darn close to it. You need to get that vocation. That'll be much more helpful. And if your counselor or your teacher feels that you're stationary with regard to your learning abilities, then get a chrono in the file and make sure it gets in there, you know. That's what the Olson review is for. Make sure it gets in there and that way we won't expect -- and I'm not going to ask you to get a GED. I'm not -- I don't make that a part of my request, but if you can get better in terms of your education, bring your TABE score up a bit, then that's only going to help you. So work on it. But if you become permanent and stationary on your ability to learn anymore, get someone to put that in your file, okay? But we don't feel that a 10 or 15 year denial is appropriate in this case but we do find that there is clear and convincing evidence based upon your history in the institution relatively recently that there is clear and convincing evidence after considering the

**EUGENE KINCAIDE    D-64290    DECISION  PAGE 6    4/16/09**

PRESIDING COMMISSIONER PRIZMICH: So with that, sir, you have a 5 year denial. We want you to become disciplinary free and work with the clinicians. Keep working on your self-help. You have -- this hearing is now concluded. The time is 1:10. We wish you luck, sir. Thank you. Make sure you got everything back. Thank You, sir.

A D J O U R N M E N T

--o0o--

PAROLE DENIED FIVE YEARS

THIS DECISION WILL BE FINAL ON: AUG 1 4 2009

YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT DATE, THE DECISION IS MODIFIED.

EUGENE KINCAIDE    D-64290    DECISION PAGE 8    4/16/09

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JEANNIE MOORS, a duly designated transcriber, FOOTHILL TRANSCRIPTION COMPANY, INC., do hereby declare and certify under penalty of perjury that I have transcribed the audio recording which covers a total of pages numbered 1-79, and which recording was duly recorded at CALIFORNIA MEDICAL FACILITY, VACAVILLE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of EUGENE KINCAIDE, CDC No. D-64290, on APRIL 16, 2009, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated APRIL 30, 2009 at Sacramento County, California.

JEANNIE MOORS, Transcriber
**Foothill Transcription Company, Inc.**